No. 66,352

SAMUEL RONALD BRIGHT, *Appellant/Appellee,* v. CARGILL, IN-
CORPORATED, *Appellee,* and LABOR SOURCE, INC., *Appellant.*

(837 P.2d 348)

Opinion filed July 10, 1992.

*Ken M. Peterson,* of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause, and *Tim J. Moore,* of the same firm, and *J. Douglas McCalla, Roy A. Jacobson, Jr.,* and *Philip White, Jr.,* of Spence, Moriarity & Schuster, of Jackson, Wyoming, were with him on the briefs for appellant/appellee Bright.

*Darrell L. Warta,* of Foulston & Siefkin, of Wichita, argued the cause, and *Craig W. West,* of the same firm, was with him on the brief for appellee Cargill, Inc.

*James Borthwick,* of Blackwell Sanders Matheny Weary & Lombardi, of Overland Park, argued the cause, and *Mary E. Kenney,* of the same firm, was with him on the briefs for appellee/appellant Labor Source, Inc.

The opinion of the court was delivered by

SIX, J.: This is a personal injury negligence action arising in a workers compensation setting. The case relates to the interplay between tort and workers compensation remedies within the relationships of statutory, special, general, and dual employers and employees.

The instant appeal involves two separate appellate alignments. The first postures plaintiff Samuel Bright against defendant Cargill, Incorporated (Cargill). The second relates to defendant Labor Source, Inc., (LSI) and Bright.

Samuel Bright's common-law negligence claim arises from an industrial accident in which he sustained serious injury. Bright and his wife, individually and on behalf of their three children,

sued Cargill, LSI (LSI is now known as LSI Corporation—Temporary Services & Placement Agency), and others not involved in this appeal. The claims of Mrs. Bright and the children were dismissed. Cargill prevailed on a summary judgment motion. The case proceeded to trial. The remaining defendants, other than LSI, settled with Bright before the case was submitted to the jury. The jury found LSI 40% at fault and Cargill 60% at fault and assessed Bright's total damages at $5,730,500. The trial court reduced the pain and suffering award to $250,000 and entered judgment for Bright against LSI in the amount of $1,884,900.

Bright appeals the summary judgment granted to Cargill. LSI appeals the judgment entered against it on the jury verdict.

Our jurisdiction is under K.S.A. 20-3018(c) by transfer from the Court of Appeals to this court.

We hold that disputed material facts exist in the resolution of Cargill's K.S.A. 44-503 "statutory employer" status. Summary judgment in favor of Cargill is reversed. Cargill's statutory employer status is to be determined on remand.

We affirm Bright's judgment against LSI subject to a determination on remand that Cargill was Bright's statutory employer. If Cargill is not Bright's statutory employer, the judgment against LSI is reversed under *Pizel v. Zuspann*, 247 Kan. 54, 77, 795 P.2d 42 (1990).

The opinion will discuss the Bright-Cargill relationship followed by our analysis of the Bright-LSI issues.

### Bright v. Cargill—The First Relationship

We are reviewing summary judgment. The tension is between statutory remedies under the Workers Compensation Act and a common-law negligence action.

The trial court ruled that one of the initial defendants, Cargill, was a K.S.A. 44-503 "statutory employer" and immune from suit under K.S.A. 1991 Supp. 44-501, the exclusive remedy provision of the Kansas Workers Compensation Act.

The issue is whether the summary judgment record supports the "statutory employer" status extended to Cargill by the trial court.

## Facts

Cargill owns and operates the Wichita terminal grain elevator where Bright's accident occurred. The storage and transportation of grain is one of Cargill's primary business operations. Cargill's C-house elevator is used for the storage of grain. A mechanical device called a leg drive is used to move grain in and out of the elevator. The use of the leg drive is the primary method of transporting grain into the C-house elevator; however, grain may also be transported into the elevator via the A- and B-house leg drives.

In early 1988, the C-house leg drive became inoperable. Cargill contracted with Southwest & Associates (Southwest) to remove and replace the leg drive. Southwest's field crews specialize in metal fabrication. The installation of the new leg drive required metal fabrication work.

The old C-house leg drive had been in place for approximately 30 years. Cargill's work order characterized the work as "abnormal replacement."

Bright, an experienced millwright and Southwest employee, was working on replacing the C-house leg drive when he was injured. Bright was riding down the descending side of the C-house manlift when a box of chains, which had been placed on a step on the ascending side of the manlift, traveled over the top of the manlift. The box struck Bright and caused him to fall approximately 25 feet to the floor of the grain elevator.

The box of chains was allegedly placed on the manlift by Gary Nanny, an employee of LSI. (Nanny's employment status was an issue at trial and is an issue in this appeal.) LSI is a temporary employment agency which had assigned Nanny to work at Cargill.

Bright has received and is still receiving workers compensation benefits from his employer, Southwest, and its insurer.

Bright sued Cargill, LSI, and others on theories of negligence, reckless and wanton conduct, strict liability, and loss of consortium. Bright advanced numerous allegations of negligence against Cargill. Bright also contended that Cargill was vicariously liable for Nanny's negligence as Nanny's employer. Bright asserted that LSI was also Nanny's employer and, consequently, vicariously liable for Nanny's negligence.

Cargill filed a motion for summary judgment, asserting that it was Bright's K.S.A. 44-503 statutory employer and, consequently, Bright's exclusive remedy was under the Workers Compensation Act. Cargill contended it was immune from a common-law negligence action. The trial court granted Cargill's motion for summary judgment, reasoning that Bright and Southwest were engaged in something that was necessarily inherent in and an integral part of Cargill's trade or business; therefore, Bright was Cargill's statutory employee.

Additional facts will be discussed where appropriate.

### Summary Judgment—Was Cargill a Statutory Employer of Bright Under K.S.A. 44-503?

A prologue to any analysis of a summary judgment issue is the recitation and acknowledgment of the movant's burden and of our scope of appellate review. The burden of the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. *Bacon v. Mercy Hosp. of Ft. Scott,* 243 Kan. 303, 306-07, 756 P.2d 416 (1988).

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file together with any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. When summary judgment is challenged on appeal, we must read the record in the light most favorable to the party who defended against the motion for summary judgment. *Patterson v. Brouhard,* 246 Kan. 700, 702-03, 792 P.2d 983 (1990).

### The Workers Compensation Act

K.S.A. 1991 Supp. 44-501(b) states in part:

"Except as provided in the workers compensation act, no employer, or other employee of such employer, shall be liable for any injury for which compensation is recoverable under the workers compensation act . . . ."

The statute is referred to as the exclusive remedy provision of the Workers Compensation Act (the Act). Under this provision, a worker may not maintain a common-law negligence action against an employer if the worker may recover benefits for an

injury from that employer under the Act. *Zehring v. Wickham,* 232 Kan. 704, 706, 658 P.2d 1004 (1983).

We have stated that the provisions of the Act are to be liberally construed for the purpose of bringing a worker under the Act whether or not desirable for the specific individual's circumstances. *Zehring,* 232 Kan. at 709. The provisions of the Act shall be applied impartially to both employers and employees. K.S.A. 1991 Supp. 44-501(g).

K.S.A. 44-503(a) provides in part:

"Where any person (in this section referred to as principal) *undertakes to execute any work which is a part of his trade or business* or which he has contracted to perform and contracts with any other person (in this section referred to as the contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any workman employed in the execution of the work any compensation under the workmen's compensation act which he would have been liable to pay if that workman had been immediately employed by him; and where compensation is claimed from or proceedings are taken against the principal, then in the application of the workmen's compensation act, references to the principal shall be substituted for references to the employer . . . ." (Emphasis added.)

K.S.A. 44-503(a) extends the application of the Act to certain individuals or entities who are not the immediate employers of the injured worker. *Hollingsworth v. Fehrs Equip. Co.,* 240 Kan. 398, 402, 729 P.2d 1214 (1986).

We observed in *Zehring* that a principal purpose of K.S.A. 44-503(a) is " 'to prevent employers from evading liability under the act by the device of contracting with outsiders to do work which they have undertaken to do as a part of their trade or business.' *Hoffman v. Cudahy Packing Co.,* 161 Kan. 345, Syl. ¶ 4, 167 P.2d 613 (1946). See also *Fugit, [Administratrix v. United Beechcraft, Inc.,],* 222 Kan. [312, 315, 564 P.2d 521 (1977)]." 232 Kan. at 707.

In *Hanna v. CRA, Inc.,* 196 Kan. 156, 159-60, 409 P.2d 786 (1966), we set out the following test to determine whether the work which gave rise to the worker's injury was a part of the principal's trade or business under K.S.A. 44-503(a):

"(1) [I]s the work being performed by the independent contractor and the injured employee necessarily inherent in and an integral part of the principal's trade or business? (2) is the work being performed by the independent

contractor and the injured employee such as would ordinarily have been done by the employees of the principal?

"If either of the foregoing questions is answered in the affirmative the work being done is part of the principal's 'trade or business,' and the injured employee's sole remedy against the principal is under the Workmen's Compensation Act."

We have adhered to the *Hanna* test. *Hollingsworth,* 240 Kan. 398; *Zehring,* 232 Kan. 704; and *Woods v. Cessna Aircraft Co.,* 220 Kan. 479, 553 P.2d 900 (1976).

## Cargill's Contentions

Cargill contends that it is immune from Bright's common-law negligence action because Bright was performing work that was a part of Cargill's trade or business, making Cargill Bright's K.S.A. 44-503(a) statutory employer. In support of its motion for summary judgment, Cargill provided 13 paragraphs of "uncontroverted facts." A number of the "uncontroverted facts" were intended by Cargill to establish that the first test from *Hanna* had been met (the work performed by Bright was necessarily inherent in and an integral part of Cargill's trade or business). These facts provided: (1) the storage of grain is one of Cargill's primary business operations; (2) Cargill's C-house is used for the storage of grain; (3) the purpose of the C-house leg drive is to transport grain for storage into the C-house elevator; (4) the C-house leg drive is the only method of transporting grain into the elevator for storage; (5) without the C-house leg drive, Cargill cannot use the C-house elevator to store grain; (6) the C-house leg drive is necessarily inherent in and an integral part of Cargill's business of storing grain; and (7) the purpose of the work being completed by Southwest was to replace the C-house leg drive and, in effect, increase the production of the elevator.

The asserted uncontroverted facts were supported by a series of affidavits from Cargill's management and employees.

Paragraphs 10 and 11 of Cargill's statement of uncontroverted facts supported the second *Hanna* test (whether the work being performed by the injured worker is work that would ordinarily have been done by the principal's employees). Paragraphs 10 and 11 stated that: (1) Cargill's employees had the equipment and skill to perform the work being done by Southwest and had performed similar work on several occasions in the past, and (2)

the type of work being performed by Southwest was work that Cargill's maintenance employees would normally perform if they had time. These asserted uncontroverted facts were supported by references to depositions of Cargill's regional production superintendent, maintenance supervisor, and elevator superintendent.

### Bright's Contentions

Bright responded in opposition to Cargill's motion for summary judgment. Bright controverted Cargill's uncontroverted fact that the C-house leg drive is the only method of transporting grain into the elevator, contending grain may also be transported into the elevator using the A- and B-house leg drives. Bright also controverted Cargill's assertion that the C-house leg drive is necessarily inherent in and an integral part of Cargill's business. Bright asserted that Cargill was conducting business as usual and did not have to shut down while the C-house leg drive was being replaced. Bright supported his statements controverting Cargill's "uncontroverted facts" with affidavits. Bright also controverted Cargill's paragraphs 10 and 11 with the deposition testimony of four Cargill employees. Generally, the employee depositions stated that the work being done by Southwest was not work that Cargill employees would normally do.

The trial court found the first *Hanna* test had been satisfied and did not discuss the second test from *Hanna*.

### The First *Hanna* Test

Bright argues the trial court erred in finding, based on the uncontroverted facts, that the work being performed by Bright and Southwest was inherent in and an integral part of Cargill's trade or business. He asserts Cargill and the trial court incorrectly focused on the *result* of the work (the necessity of the equipment) rather than the *type* of work being done by Bright and Southwest (a task of major replacement, involving structural modification). He asserts Cargill presented no evidence bearing on the issue of whether comparable companies would have done this type of major replacement. Bright argues that Cargill only presented evidence regarding the importance of the C-house leg drive to Cargill's business operation. Bright would submit the issue to a jury.

Statutory Employer—Is the Work Part
of the Principal's Trade or Business?

In *Lessley v. Kansas Power & Light Co.*, 171 Kan. 197, 231 P.2d 239 (1951), a public utility (KP&L) was engaged in the production, sale, and transmission of electric power. The company was authorized by its articles of incorporation to build and construct power plants and power houses.

The issue was whether the work being performed by Lessley, who was injured while an employee of a subcontractor, was part of KP&L's trade or business. We relied on *Williams v. Cities Service Gas Co.*, 139 Kan. 166, 30 P.2d 97 (1934), and *Purkable v. Greenland Oil Co.*, 122 Kan. 720, 253 Pac. 219 (1927). We concluded KP&L was a public utility with the express power to build and construct power plants. The result was that the new power plant construction work for which KP&L had contracted was a part of KP&L's trade or business. *Lessley*, 171 Kan. at 208. Cargill invokes *Lessley* as support for the trial court's summary judgment ruling in the case at bar.

In *Hataway v. Procter & Gamble Manufacturing Co.*, 195 Kan. 335, 405 P.2d 350 (1965), we permitted an injured worker to maintain a common-law negligence action. Hataway, an employee of a construction company, was injured during construction of an addition to Procter & Gamble's plant. Hataway sued Procter & Gamble. The trial court granted Procter & Gamble's motion for summary judgment on the grounds that Hataway's sole remedy was under the Workers Compensation Act. The issue on appeal was whether Procter & Gamble was Hataway's statutory employer under K.S.A. 44-503(a): Was the work being done by Hataway and his immediate employer part of Procter & Gamble's trade or business? Procter & Gamble relied on *Lessley*. We distinguished *Lessley*, reasoning that KP&L, as a public utility, was authorized by its articles of incorporation to do all things necessary for the conduct of a general electric business, and also to *build* and *construct* power plants. 195 Kan. at 337; see *Zehring*, 232 Kan. at 708.

Reversing summary judgment in Hataway, we reasoned: "[T]he construction of the Tide Building was not work which the manager of the Procter & Gamble soap company would ordinarily have

done through employees of the business of manufacturing soaps and detergents." 195 Kan. at 340.

In *Woods v. Cessna Aircraft Co.,* 220 Kan. 479, a construction company employee was killed during construction of a hangar for Cessna Aircraft Company (Cessna). The employee's father brought a wrongful death action against Cessna. The trial court granted summary judgment to Cessna, finding the construction work was an integral part of Cessna's business. We observed that the *Hanna* tests may overlap and are in the alternative. 220 Kan. at 484. If either test is met K.S.A. 44-503 applies. We found no evidence under the second *Hanna* test that Cessna employees had previously constructed hangars or that Cessna had the necessary skilled employees and equipment to complete the work. We reversed summary judgment for Cessna, citing 1A Larson, Workmen's Compensation Law § 49.12 (1973); 81 Am. Jur. 2d, Workmen's Compensation § 128, p. 808; and 99 C.J.S., Workmen's Compensation §§ 107-09. 220 Kan. at 486.

In *Zehring v. Wickham,* 232 Kan. 704, we did not state which of the two *Hanna* tests had been satisfied. The Wickham Glass Company, a glazing contractor, had carried on its own construction in the past (the second *Hanna* test). The construction of an addition, which was to house a large glass tempering oven, a piece of equipment integral to the business, was part of Wickham's overall operation (the first *Hanna* test). The use of both tests is consistent with our statement in *Woods* that the two *Hanna* tests may overlap.

Our most recent application of the *Hanna* tests is found in *Hollingsworth v. Fehrs Equip. Co.,* 240 Kan. 398. Hollingsworth, an employee of contractor John T. Cody Corporation (Cody), was injured at a Farmland Industries, Inc., (Farmland) fertilizer plant. Hollingsworth sued Farmland for negligence. The trial court granted Farmland's motion for summary judgment on the basis that Farmland was a statutory employer of Hollingsworth. The Farmland plant employed 270 workers, including 90 maintenance personnel. Operation of the Farmland plant required periodic shutdowns for normal maintenance and repairs. Following such a shutdown, a leak occurred in a heat boiler requiring a complete plant shutdown. Cody was employed to do the repair, which required replacement of the "tube bundle" in the boiler. The

Farmland plant kept spare tube bundles for such a purpose. The trial court relied on *Lessley* to find that the work being performed by Cody and Hollingsworth was necessarily inherent in and an integral part of Farmland's trade or business. We affirmed the trial court's ruling and reliance on *Lessley*. 240 Kan. at 404-05. We also found evidence satisfying the second *Hanna* test: (1) a third of the 270 employees were maintenance personnel and (2) Farmland's employees had replaced tube bundles in the past.

Bright argues that *Lessley* is an anomaly and does not remain viable today. *Hollingsworth, Zehring,* and *Hanna* have embraced language from *Lessley*. In *Hataway,* (Procter & Gamble was the defendant) we distinguished *Lessley* on the grounds that KP&L, the defendant in *Lessley,* was a public utility with express powers to build and construct power plants. *Hataway,* 195 Kan. at 340.

The K.S.A. 44-503(a) tapestry we have judicially woven over the past 65 years does not present the earnest viewer with an easily recognizable pattern for statutory employer identification. In *Hanna,* we noted that each case must be determined on its own particular facts and circumstances. 196 Kan. at 159.

We endorse the rationale expressed by Larson's treatise on workers compensation:

"In some of the closer cases, which in the abstract look as though they might be decided either way, the courts rely heavily upon evidence of the past practice of this employer and employers in a similar business. . . .

". . . [T]he *test is not one of whether the subcontractor's activity is useful, necessary, or even absolutely indispensable to the statutory employer's business,* since, after all, this could be said of practically any repair, construction or transportation service. The test (except in cases where the work is obviously a subcontracted fraction of a main contract) is whether this indispensable activity is, in that business, normally carried on through employees rather than independent contractors." (Emphasis added.) 1C Larson, Workmen's Compensation Law § 49.16(j), pp. 9-105 - 9-106 (1991).

In *Woods,* we reversed summary judgment. We reasoned that construction work, such as the building of a factory structure, is ordinarily outside the trade or business of a manufacturing or mercantile establishment. However, if the business customarily carries on a program of construction, replacement, and maintenance or has handled its own construction work, a contract for such construction falls within K.S.A. 44-503(a). *Woods* relied on Larson, Workmen's Compensation Law. 220 Kan. at 486. The

section of Larson cited in *Woods* is found in the 1991 edition at 1C Larson, Workmen's Compensation Law § 49.16(c), pp. 9-56 - 9-72, and states as follows:

"Ordinarily construction work, such as building a factory structure, *installing a conveyor system*, . . . would be considered outside the trade or business of a manufacturing or mercantile establishment. But if the defendant is a business which by its size and nature is accustomed to carrying on a more or less ongoing program of construction, replacement, and maintenance, perhaps even having a 'construction division,' or which can be shown to have handled its own construction in the past, a job of construction delegated to a contractor will be brought within the statute." (Emphasis added.)

The first test of *Hanna*, whether the work is inherent in and an integral part of the principal's trade or business, asks what other similar businesses do. Applied to the case at bar, would a similar grain elevator do the work at issue through employees or contract the work to millwrights? Overlap with the second test of *Hanna* (whether the particular principal would normally do the work through its own employees) may occur. Even if other similar businesses would not perform the work through employees, the particular principal may make such work "a part of its trade or business" by its own past actions.

We disapprove of our prior decisions to the extent that they conflict with the analysis of the *Hanna* tests set out in this opinion.

Viewing the uncontroverted evidence in the case at bar, in the light most favorable to Bright, Cargill has not shown, as a matter of law, that the work being performed by Bright and Southwest, replacing the C-house leg drive, was inherent in and an integral part of Cargill's trade or business. Cargill's uncontroverted facts only show that the C-house leg drive was a necessary and integral piece of equipment which had to be replaced. The facts supporting our conclusion are: (1) Cargill's work order deemed the work "abnormal replacement"; (2) the C-house leg drive had been in place for 30 years without the need for replacement; and (3) the replacement required metal fabrication work to accomplish structural modification. Cargill presented no evidence that other similar businesses would undertake such work through their own employees.

### The Second *Hanna* Test

Cargill set forth the following as uncontroverted facts supporting the second *Hanna* test (whether the work being performed by Southwest and Bright is work that would ordinarily have been done by the employees of Cargill).

"10. Cargill's employees had the skill and equipment to perform the work being done by Southwest. They performed similar work on several occasions in the past.

"11. The type of work being performed by Southwest was work that Cargill's maintenance employees would normally perform if they had time."

In its memorandum in support of summary judgment, Cargill relied on the following summarized deposition testimony of its maintenance and elevator supervisors.

The supervisors were familiar with the work. The general description of the work was replacing a motor and reducer. Cargill did not have time to do the job with its employees. The work is the type of work which Cargill performs and has performed on other occasions. Cargill's work force had the capability of doing the work but Cargill did not do the work because it was short-handed and there were other duties its employees needed to do.

Bright controverted the supervisors' deposition testimony with deposition testimony of four other Cargill employees. The four employees had been employed by Cargill for 8.5, 6.5, 11, and 14 years, respectively.

The summarized testimony of the four Cargill employees reflected that the kind of work that was being done by Southwest was not the kind one would expect to or normally see a Cargill employee perform. It is the kind of work that is normally contracted out; the type left to professionals that know what they are doing. The 6.5-year employee had never seen Cargill employees do that kind of work. It is the kind of work that ordinarily would not be done by Cargill employees. The 11-year employee had never done that kind of work. He did not know of anyone else in the plant who had replaced a leg chain drive, reducer, or motor in a leg drive such as Southwest was doing. The 14-year employee agreed that the work Southwest was doing was not the kind of work that normally would be done by Cargill employees. He had never seen any Cargill employees undertake that kind of job.

Bright maintains that Cargill may not rely on the deposition testimony cited in support of its "uncontroverted facts" because the depositions were not "on file" in the district court as required by K.S.A. 1991 Supp. 60-256. We need not address the argument for two reasons: (1) Bright did not raise this issue below, *Plummer Development, Inc. v. Prairie State Bank,* 248 Kan. 664, 671, 809 P.2d 1216 (1991); and (2) the issue is moot because we find that Bright sufficiently controverted Cargill's "uncontroverted facts," precluding summary judgment.

Cargill argues that the deposition testimony used by Bright to controvert Cargill's "uncontroverted facts" is from nonmaintenance employees at Cargill who did not know about Cargill's maintenance procedures; therefore, such deposition testimony may not be used to controvert Cargill's "uncontroverted facts" which are supported by supervisor depositions. Bright counters that this is a credibility issue for the trier of fact. We agree with Bright.

Viewing the evidence in the light most favorable to Bright, as we must, Bright has controverted Cargill's "uncontroverted facts," ¶¶ 10 and 11.

A genuine issue of material fact, the K.S.A. 44-503(a) status of Cargill, exists which precludes summary judgment. We reverse the trial court's granting of Cargill's motion for summary judgment.

### LSI's Appeal—The Second Relationship

Bright and LSI were the only parties when the case was submitted to the jury.

LSI asserts trial court error, contending: (1) Its motion for directed verdict should have been sustained because the borrowed servant doctrine makes Cargill solely liable for Nanny's negligence; (2) the jury was not instructed properly on: (a) the borrowed servant doctrine, and (b) Cargill's negligence independent from Cargill's vicarious liability for Nanny's negligence; (3) Nanny was Bright's fellow servant and immune from liability under K.S.A. 1991 Supp. 44-501; consequently, LSI is not vicariously liable for Nanny's negligence and LSI's motion for a directed verdict should have been sustained; and (4) the entire K.S.A. 1991 Supp. 60-19a01 pain and suffering statutory limit of

$250,000 should not have been imposed on LSI as the jury found LSI only 40% at fault.

## Rulings of the Trial Court

The trial court denied LSI's motion for directed verdict on the borrowed servant issue, reasoning that a question of fact was presented for the jury to determine (whether Nanny was Cargill's borrowed servant or the dual employee of LSI and Cargill). As to the fellow servant issue, the trial court found K.S.A. 1991 Supp. 44-501 (workers compensation immunity) inapplicable.

## Standard of Review

The directed verdict standard of appellate review requires us to resolve all facts and inferences to be reasonably drawn from the evidence in favor of Bright. When the evidence is such that reasonable minds could reach a different conclusion, the motion must be denied and the matter submitted to the jury. *Sterba v. Jay,* 249 Kan. 270, 277, 816 P.2d 379 (1991).

## The Borrowed Servant Doctrine

The LSI-Nanny-Cargill employment relationship was developed at trial.

LSI is a temporary employment agency owned and operated by brothers Ron and Rick King. Ron and Rick are the sons of Don King, Cargill's Regional General Superintendent. LSI's staff, in addition to Ron and Rick, consisted of their mother and a receptionist/clerical worker. LSI is in the business of providing unskilled general laborers to industry on a temporary basis. At the time of trial, LSI employed in excess of 125 employees serving over 200 companies.

In October 1987, Nanny responded to an LSI advertisement, filled out an application, was interviewed, and hired by Rick. Rick initially assigned Nanny to work at the Cargill 13th Street flour mill. In January 1988, Nanny was reassigned to the Wichita terminal elevator where Bright's accident occurred. Rick told Nanny where to go, to whom to report, and that Cargill would give him detailed information on what would be expected.

Nanny was trained and supervised by Cargill employees. Cargill set Nanny's hours and directed the method and manner in which he was to do the work. Cargill provided all necessary tools and equipment except a hard hat provided by LSI.

Nanny kept his time on an LSI time slip. He turned the slip into Cargill daily and delivered it weekly to LSI. Cargill paid LSI $7.10 per hour for Nanny's work. LSI paid Nanny $4 per hour. LSI withheld and provided the usual payroll expenses and benefits such as state and federal taxes, social security, unemployment, and workers compensation. LSI received approximately $1.60 per hour in net revenue from Nanny's employment. LSI processed the paper work. The on-site work instruction was Cargill's responsibility.

Cargill could reprimand, discipline, or terminate Nanny from Cargill but could not terminate Nanny from LSI. LSI was free to reassign Nanny to another employer at any time. Cargill terminated Nanny a short time after Bright's accident; however, LSI did not. LSI assigned Nanny to additional industrial companies.

Ron King testified that both he and Rick occasionally visited the work sites where LSI employees had been placed. Ron and Rick both visited the Cargill plant while Nanny was assigned to Cargill. Ron testified that if he saw an unsafe condition that endangered one of his employees, he would correct the situation. Once he told an LSI customer that the customer would have to hire the LSI temporary employee. The customer did.

Cargill's management considered Nanny a Cargill employee as well as an LSI employee. Nanny considered himself an employee of both Cargill and LSI. However, Nanny did not feel he had the rights of a Cargill employee because he could be terminated any time and he was not represented by the union, as were other Cargill employees.

## The Borrowed Servant Doctrine Contentions of LSI

LSI argues that the trial court erred in denying its motion for a directed verdict because the borrowed servant doctrine imposes responsibility for Nanny's negligence on Cargill and not LSI. LSI contends that because Cargill had the right to control Nanny's specific activities, i.e., use of the manlift that allegedly caused Bright's injuries, Cargill is solely liable for Nanny's alleged negligence. LSI would place liability on Cargill, which trained and supervised Nanny, on the basis of a public policy argument of resting liability on the party in the position to avoid the negligent act.

### Bright's Borrowed Servant Doctrine Contentions

Bright contends LSI admits Nanny was its employee. Nanny was acting within the scope of his employment with LSI by working at Cargill. At the time of Bright's injury, Nanny was engaged in the work LSI hired him to do; therefore, LSI is vicariously liable. Bright argues that the borrowed servant doctrine does not apply in a temporary labor situation because the borrowed servant (Nanny) is not "borrowed" from his work with his first employer (LSI). Nanny did not begin to work for LSI until he began to work for Cargill. By working for Cargill, doing the work he was hired and directed by LSI to do, he became and remained LSI's employee. In contrast, the borrowed servant abandons the work of the first employer and takes up the work of the second employer.

Bright reasons that a temporary labor situation as presented in the case at bar involves a dual employment where the first employer (LSI) is not relieved of liability and both employers are vicariously liable for the employee's acts. Even if the borrowed servant doctrine applies, Bright argues that LSI is not relieved of liability because it retained the right to control Nanny. LSI had the right to determine where Nanny worked and the right to discharge Nanny. Bright contends that public policy will not be furthered by relieving LSI of liability. According to Bright, LSI made a profit sending employees to dangerous industrial environments and must, therefore, accept the risk of liability which accompanies such an enterprise.

### The Borrowed Servant Doctrine Analysis

In Kansas, an employer who temporarily borrows an employee may become liable for the employee's negligence. The "borrowing employer" is sometimes referred to as the "special employer," and the "lending employer" is sometimes referred to as the "general employer." In *Baker v. Petroleum Co.*, 111 Kan. 555, 560, 207 Pac. 789 (1922), we stated: "It is well settled that the servant of A may for a particular purpose, or on a particular occasion, be the servant of B, though he continues to be the general servant of A and is paid by him for his work."

The tests for determining whose employee a person is at a particular time, *i.e.*, which employer is vicariously liable for the

employee's negligence, has been stated in various ways. In *Beitz v. Hereford,* 169 Kan. 556, Syl. ¶ 2, 220 P.2d 135 (1950), we summarized the tests as follows:

"Whose work was the person doing at the particular time?

"What person had authority to discharge the workman?

"Who had the right to exercise supervision and control over the workman and to determine the manner in which the work was to be done rather than who actually exercised such control?"

The *Beitz* tests were quoted with approval in *Belger Cartage Serv., Inc. v. Holland Constr. Co.,* 224 Kan. 320, Syl. ¶ 1, 582 P.2d 1111 (1978), our most recent borrowed servant case.

The borrowed servant doctrine is stated in Restatement (Second) of Agency § 227, p. 500 (1957): "A servant directed or permitted by his master to perform services for another may become the servant of such other in performing the services. He may become the other's servant as to some acts and not as to others." The comments to § 227 provide additional analysis of the doctrine.

Also pertinent is Restatement (Second) of Agency § 226 (1957), which provides: "A person may be the servant of two masters, not joint employers, at one time as to one act, if the service to one does not involve abandonment of the service to the other."

Bright relies on *Voss v. Bridwell,* 188 Kan. 643, 364 P.2d 955 (1961), a medical malpractice case. Voss sued Bridwell, a surgeon; Sen, an anethetist-resident; and Davies, the department head of anesthesiology, for negligent administration of anesthetic. Voss sought to hold Bridwell and Davies liable for Sen's alleged negligence under a respondeat superior theory. We held that Bridwell and Davies could both be vicariously liable for Sen's alleged negligence, citing Restatement (Second) of Agency § 226. Bridwell, the surgeon, could be liable because Sen was his agent during surgery. Davies could be responsible for Sen's negligent acts because Davies was responsible for administering anesthesia and undertook the administration of anesthesia through Sen.

LSI counters that *Voss* and Section 226 of the Restatement (Second) of Agency only apply where two employers employ a single person for separate acts rather than employment for overlapping purposes. LSI reasons that the servant, Sen, was not borrowed. Bridwell and Davies each employed Sen for separate

purposes at the time of Voss' injuries. According to LSI, Bridwell employed Sen to prepare Voss for surgery, while Davies was responsible for Sen's training and education. By contrast, LSI asserts that at the time of Bright's accident LSI had no separate purpose or responsibility for the work Nanny was doing at Cargill.

*Voss* should be compared with *Baker, Moseman v. Penwell Undertaking Co.,* 151 Kan. 610, 615, 100 P.2d 669 (1940), *Beitz,* and *Belger Cartage,* a quartet of borrowed servant cases.

Each case is fact specific. Blending the five cases together results in only modest guidance for resolving the case at bar. The controlling theme of the five cases is that where reasonable minds could differ, the determination of whether "loaned" employees become the employees of the borrower was left to the trier of fact.

In the case at bar, Bright relies on the following cases which have held that both the general employer and the special employer may be held vicariously liable for the borrowed servant's negligence. *Strait v. Hale Constr. Co.,* 26 Cal. App. 3d 941, 103 Cal. Rptr. 487 (1972); *LeJeune v. Allstate Ins. Co.,* 365 So. 2d 471 (La. 1978); and *Lowenburg v. Labor Pool of America, Inc.,* 296 So. 2d 846 (La. App. 1974).

*Strait* and *Lowenburg* are persuasive. In *Strait,* the California Court of Appeal noted the modern justification for vicarious liability is based on allocation of risk. When the employer profits from an enterprise, the employer should bear the cost of employee torts because the employer is better able to absorb them through prices and liability insurance, which have the effect of shifting the cost to society. This cost-shifting concept is known as enterprise justification. *Strait* rejected the control justification rationale. 26 Cal. App. 3d at 949.

*Lowenburg* involved vicarious liability of an employment agency and, consequently, is similar to the case at bar. Defendant Labor Pool of America, Inc., (Labor Pool) supplied defendant Mike Smith, a truck owner, with the tortfeasor driver, Babin. Smith leased his truck, including the driver Babin, to Carrolton. Babin injured a pedestrian, who sued Labor Pool and Smith. Smith's insurer asserted that Babin, the truck driver, was the borrowed servant of Carrolton at the time of the accident. Rejecting this argument, the Louisiana Court of Appeals noted that

Babin was at all times the employee of Labor Pool and subject to its direct orders. Babin was employed and directed where to go by Labor Pool. The control by Labor Pool was sufficient to hold Babin to be Labor Pool's employee acting within the scope of his employment.

We have noted recently that the modern rationale for vicarious liability is the enterprise justification concept referred to in *Strait*. *Bair v. Peck*, 248 Kan. 824, 830, 811 P.2d 1176 (1991). Under such a justification, the losses caused by an employee's tort are placed on the enterprise as a cost of doing business and on the employer for having engaged in the enterprise. LSI engaged in the enterprise of renting its employees and received revenue from that activity. Therefore, LSI should be held liable unless LSI relinquished sufficient control of Nanny to establish abandonment.

Cargill had the right to control Nanny's specific act that gave rise to the cause of action—moving freight on the manlift. Cargill also had the right to discharge Nanny from Cargill's employment. However, Cargill could not discharge Nanny from his employment with LSI. LSI directed Nanny to report to Cargill and to follow Cargill's instructions. Further, LSI had the right to reassign Nanny to another of its customers. Nanny was responsible for turning in his time slips weekly to LSI. Ron King of LSI testified that if he saw an unsafe condition and he determined an employee might be in danger of injury, he would stop it. On one occasion, he required the customer to hire the temporary employee. Nanny's work benefited both Cargill and LSI. Cargill received the labor while LSI received revenue. Nanny performed the work LSI hired him to do.

The Nanny-LSI-Cargill relationship presented a fact issue for the jury as to whether LSI relinquished sufficient control of Nanny to establish abandonment. The trial court did not err in submitting the issue to the jury.

### The Jury Instructions

LSI asserts that if we determine vicarious liability for Nanny's negligence was a proper jury question, LSI is entitled to a new trial because the jury instructions were prejudicially erroneous.

First, LSI argues that an instruction on dual employment was not supported by the evidence. According to LSI, the jury should

have been instructed that either Cargill or LSI was solely liable depending on which entity controlled Nanny's conduct. In the alternative, LSI reasons the jury should have been told it could apportion Nanny's negligence between Cargill and LSI. LSI challenges certain instructions and the verdict form.

Bright contends that every act Nanny performed for Cargill was at the same time an act for LSI; therefore, the apportionment of vicarious liability for Nanny's negligence would be inappropriate. Additionally, Bright asserts that LSI did not raise the apportionment issue below and has cited no authority for it on appeal. Bright would characterize the instructions, when considered as a whole, as proper.

If the instructions are substantially correct and the jury could not reasonably be misled by them, the instructions will be approved on appeal. *Sterba v. Jay,* 249 Kan. 270, 277, 816 P.2d 379 (1991).

The challenged instructions concerned in substance:

Whether Nanny was acting within the scope of his employment with LSI. No. 14.

Whether a person may be the employee of two employers at one time. No. 15.

Parties to whom fault may be assigned, including "LSI-Gary Nanny." No. 19.

Addressing LSI's argument that the jury should have been instructed to apportion vicarious liability for Nanny's negligence between LSI and Cargill, the record reflects that this issue was not raised below. Issues not raised below may not be raised for the first time on appeal. *Plummer Development, Inc. v. Prairie State Bank,* 248 Kan. 664, 671, 809 P.2d 1216 (1991).

LSI argues that instruction No. 14 constituted prejudicial error because it asked the jury to determine the scope of employment only as to LSI and not as to Cargill. LSI asserts there was no issue as to whether Nanny acted within the scope of employment with either LSI or Cargill; the issue was which of the two employers was liable. Therefore, LSI argues, the instruction unfairly guided the jury to conclude LSI was solely responsible for Nanny's negligence. Bright does not specifically address instruction No. 14.

At the instruction conference, LSI objected to instruction No. 14 on the grounds that "agency is not an issue" in the case. LSI did not assert that the instruction unfairly focused attention on LSI; nor did LSI request that a scope of employment instruction be given as to Cargill. A party may not assign as error the giving or failure to give an instruction unless the party objects before the jury retires to consider its verdict. The objection must distinctly state the matter to which the party objects and the grounds for such objection unless the instruction is clearly erroneous. *Lostutter v. Estate of Larkin*, 235 Kan. 154, 164, 679 P.2d 181 (1984).

Instruction No. 14 was not clearly erroneous. At the time the case was submitted to the jury, LSI was the only remaining defendant. Bright's claim against LSI was for vicarious liability for Nanny's negligence. As an element, Bright had to show Nanny's act was within the scope of Nanny's employment with LSI. LSI contended that Cargill solely was vicariously liable. To prove sole liability, LSI had to show Nanny's act was within his scope of employment with Cargill. LSI is correct in asserting that Nanny's scope of employment was not a contested issue. Any possible unfair focus on LSI was because LSI did not request a scope of employment instruction as to Cargill. LSI has not shown prejudicial error.

With regard to instruction No. 15, LSI contends that the instruction submitted the issue of dual employment, not loaned employment. LSI argues that the jury should have been instructed to choose whether LSI or Cargill was liable for Nanny's negligence.

LSI's loaned employment argument lacks merit. There was sufficient evidence to submit both dual employment and loaned or borrowed employment to the jury. The jury was instructed that it could find that Nanny was solely an employee of LSI, solely an employee of Cargill, or the dual employee of both.

Alternatively, LSI asserts instruction No. 15 was flawed under the dual employment doctrine. LSI complains that "abandonment" was not defined. In addition, LSI contends that none of the four numbered factors set out in the instruction were helpful to the jury in determining whether either LSI or Cargill or both were liable.

The instruction No. 15 numbered factors were:

"1. Who benefited from the work of Gary Nanny.

"2. Whether Gary Nanny received from LSI or Cargill, Inc. the benefits that an employer would normally provide its employee.

"3. Who had the right to control the work of Gary Nanny, regardless of whether or not it actually exercised any aspect of its control over him. The right to control includes:

    a. the right to assign and reassign

    b. the right to terminate

    c. the right to control payment of wages and the amount paid

    d. the right to retain an employee after the end of a particular assignment

"Actual control is not essential. It is the right to control that is determinative. The right to supervise, in and of itself, even as to the work and manner of performance, is not sufficient to establish the right to control.

"4. Whether in performing his work at Cargill, Nanny was abandoning the service of LSI."

Bright contends the instruction No. 15 arguments were not raised below and does not address them in his brief. Bright is incorrect; LSI objected to the instruction on the basis of (a) the case being submitted on dual, not loaned, employment, (b) abandonment not being defined, and (c) the four numbered factors were not helpful.

A trial court is not required to define every phrase used in an instruction unless from a fair reading of the instructions as a whole there is a likelihood the jury will be misled or left to speculate without further explanation. *McGlothlin v. Wiles*, 207 Kan. 718, 726, 487 P.2d 533 (1971). Based on this standard, "abandonment" did not need to be defined. The parties were free to argue evidence supporting abandonment in closing.

Rather than the factors set out in instruction No. 15, LSI requested the factors from Restatement (Second) of Agency § 220(2) (1957). Factor 2 of instruction No. 15, "[w]hether Gary Nanny received from LSI or Cargill, Inc. the benefits that an employer would normally provide its employee," favors Bright's claim against LSI. However, the evidence at trial showed that LSI provided Nanny with workers compensation coverage and paid unemployment taxes for him. This evidence supports dual employment. The other three factors of instruction No. 15 (Nos. 1, 3, and 4) are supported by the evidence and by case law. See *Belger Cartage Serv., Inc. v. Holland Constr. Co.*, 224 Kan. 320,

582 P.2d 1111 (1978); *Voss v. Bridwell,* 188 Kan. 643, 364 P.2d 955 (1961); *Mendel v. Fort Scott Hydraulic Cement Co.,* 147 Kan. 719, 78 P.2d 868 (1938); *Strait,* 27 Cal. App. 3d 941; *LeJeune,* 365 So. 2d 471; *Lowenburg,* 296 So. 2d 846. LSI has not shown prejudice.

With respect to instruction No. 19 and the verdict form, LSI objects to the listing "LSI-Gary Nanny." LSI argues that listing LSI and Nanny together impermissibly suggested that the jury find that Gary Nanny was solely the employee of LSI. LSI objected on this ground at the instruction conference. The trial court reasoned that instruction No. 15, which instructed the jury it could find Nanny was solely the employee of LSI, solely the employee of Cargill, or the dual employee of both LSI and Cargill, considered together with instruction No. 19, was proper. The trial court stated that LSI could argue to the jury that LSI is not liable unless the jury finds that Nanny was its employee.

Bright asserts that his claim against LSI was submitted to the jury solely on the theory of respondeat superior. The questions for the jury were whether Nanny was negligent and whether Nanny was LSI's employee, either solely or dually. Thus, LSI was free to argue that the jury should assign 0% fault to "LSI-Nanny" if the jury found that Nanny was solely the employee of Cargill.

The closing arguments in this case are not included in the record on appeal. The trial court granted LSI permission to argue to the jury the basis for its objections to instruction No. 19 and the verdict form. Because LSI was free to argue assignment of fault in closing, the instructions, taken as a whole, were not prejudicially flawed.

LSI asserts it requested the trial court to instruct the jury on the theory that Cargill was negligent in failing to properly supervise its employees and in failing to provide a safe place to work. LSI references proposed instructions Nos. 14 and 18-21, but provides no citation to the record. LSI's proposed instructions Nos. 14 and 18-21 do not relate to Cargill's negligence. LSI did not request such instructions or object to the trial court's refusal to so instruct at the instruction conference. This issue has not been preserved for appeal. *Lostutter,* 235 Kan. at 164.

Next, LSI objects to instruction No. 10, which stated:

"Counsel and witnesses in this case have made reference to OSHA investigations and to OSHA regulations and violations. You are to consider the negligence of all the parties in making your determinations as to fault.

"Accordingly, you are not to consider the effect of any OSHA regulations or violations as dispositive of negligence in this case. Rather, this jury must make its findings regarding negligence based upon all of the evidence presented on the witness stand."

LSI had requested instructions to the effect that if the jury found Cargill had violated OSHA regulations, Cargill was negligent per se. LSI objected to instruction No. 10 as given and to the failure to give its proposed negligence per se instructions.

LSI asserts on appeal that instruction No. 10 constituted reversible error because it did not define "dispositive."

The argument that we must reverse because "dispositive" was not defined lacks merit. We reason that the jurors understood the word and were not misled by it. See *McGlothin*, 207 Kan. at 726.

Finally, LSI reasons the trial court erred in refusing to instruct on Cargill's premises liability negligence based on a theory that Bright was a business invitee. The trial court found that the premises liability instructions were not applicable. LSI objected.

Premises liability was not one of LSI's allegations of fault directed at Cargill as set forth in instruction No. 3, which listed the claims of the parties. The trial court did not abuse its discretion in failing to instruct on premises liability.

### Is LSI Immune From Liability Under K.S.A. 1991 Supp. 44-501?

LSI moved for a directed verdict on Bright's respondeat superior claim on the grounds that Bright and Nanny were co-employees under the Workers Compensation Act. The trial court denied the motion, reasoning that the Act did not supply immunity to LSI.

LSI argues that if Bright is Cargill's statutory employee, then Bright and Nanny were co-employees because Nanny was Cargill's statutory and/or special (borrowed) employee. As Bright's co-employee, according to LSI, Nanny is immune from a common-law negligence action under K.S.A. 1991 Supp. 44-501(b). LSI contends that if Nanny is immune, LSI cannot be vicariously liable

for Nanny's negligence because vicarious liability is derivative of and secondary to Nanny's liability.

Bright responds: (1) He was not Cargill's statutory employee; (2) even if he were, the Act only provides immunity for statutory employers and not for "statutory co-employees"; and (3) even if Nanny is immune under K.S.A. 1991 Supp. 44-501(b), the co-employee immunity is personal to Nanny and would not inure to the benefit of LSI. Bright reasons that because LSI had no responsibility to provide workers compensation benefits to him, LSI is not entitled to immunity under the Act.

The question of LSI's 44-501 immunity is one of first impression. Our resolution requires review of several provisions of the Act.

K.S.A. 1991 Supp. 44-501(b), which grants employer and co-employee immunity, provides: "Except as provided in the workers compensation act, no employer, *or other employee of such employer,* shall be liable for any injury for which compensation is recoverable under the workers compensation act . . . ." (Emphasis added.)

K.S.A. 1991 Supp. 44-501(b) in conjunction with K.S.A. 44-503(a) grants immunity to the principal (Cargill). K.S.A. 44-503(a) states that when proceedings are taken against the principal, references to the principal shall be substituted for references to the employer. Therefore, under K.S.A. 1991 Supp. 44-501(b) no "principal, or other employee of such principal" shall be liable for any injury for which compensation may be recovered under the Act.

The jury was instructed in instruction No. 15: "With regard to Gary Nanny, you may find that he was solely an employee of LSI, solely an employee of Cargill, Inc. or the dual employee of both LSI and Cargill, Inc." By assessing 40% fault to LSI-Gary Nanny, the jury found that either Nanny was the sole employee of LSI or the dual employee of both Cargill and LSI.

LSI relies on *Jacobson v. Parrill,* 186 Kan. 467, 351 P.2d 194 (1960), where Jacobson sued the agent-tortfeasor's principal on a respondeat superior theory. Jacobson had settled with and released the agent-tortfeasor. We held that the full satisfaction of liability against the agent-tortfeasor barred any claim against the principal based on respondeat superior. 186 Kan. at 473.

Bright would distinguish *Jacobson*. In the case at bar, there was no exoneration or satisfaction of Nanny's liability. Bright argues that even if Nanny is found to be immune, such immunity should not be extended to protect LSI. Bright relies on *Marsh v. Tilley Steel Co.*, 26 Cal. 3d 486, 162 Cal. Rptr. 320, 606 P.2d 355 (1980), and *Kenyon v. 2nd Precinct Lounge*, 177 Mich. App. 492, 442 N.W.2d 696 (1989).

In *Marsh*, Marsh, an employee of Maxwell Construction Company (Maxwell), a general concrete contractor, brought a personal injury action against Tilley Steel Company (Tilley), a subcontractor, which was the employer of a crane operator whose alleged negligence caused Marsh's injuries. Marsh's claim against Tilley was based on a respondeat superior theory. Tilley argued on appeal that if the crane operator was Maxwell's special (borrowed) employee, the crane operator would become Marsh's fellow employee. In California, recovery of benefits under the workers compensation act is the injured worker's sole remedy against " 'the employer or against any other employee of the employer . . .' (Lab. Code, § 3601, subd. (a)." 26 Cal. 3d at 495. Therefore, Tilley asserted, the crane operator as a fellow employee would be immune from liability to Marsh, and Tilley could have no vicarious liability if the crane operator is immune. The California Supreme Court rejected Tilley's argument, relying on *Campbell v. Harris-Seybold Press Co.*, 73 Cal. App. 3d 786, 141 Cal. Rptr. 55 (1977). If the tortfeasor is not the plaintiff's employer or co-employee, the statutes by necessary implication reserve for plaintiff his tortious remedy against defendant. General respondeat superior principles seek to place the cost of work-related negligence on those enterprises that have produced the negligence risk. The negligent risk policy would be defeated by extending to an employer the benefit of a technical defense reserved solely for the employee. A defendant has no workers compensation responsibility to a plaintiff who is not its employee. A defendant should not be relieved from its normal respondeat superior liability, while at the same time giving no accompanying benefit to the workers compensation system. 26 Cal. 3d at 496.

In *Kenyon*, Kenyon, an employee of Tuff-Kote, Inc., (Tuff-Kote) was injured by the alleged negligence of Widick, an employee of labor broker Employers Temporary Service, Inc. (ETS). ETS

had assigned Widick to work at Tuff-Kote. Kenyon sued Widick and ETS. ETS argued that Widick was employed by both Tuff-Kote and ETS; thus, Widick was Kenyon's co-employee and immune under Michigan's workers compensation act. If Widick was immune, ETS argued, it could not be held liable for Widick's negligence under the theory or respondeat superior. The Michigan Court of Appeals found that Kenyon and Widick were co-employees of Tuff-Kote. Relying on *Marsh*, the *Kenyon* court concluded:

"[T]he immunity granted by the workers' compensation act is personal and does not purport to grant derivative immunity to general employers in the position of ETS. Additionally, like Tilley Steel in *Marsh*, ETS here had no workers' compensation responsibility to plaintiff since it was not his employer. To grant ETS derivative immunity would effectively shield it from all liability, either for common-law damages or for workers' compensation benefits, without obtaining any accompanying benefit to the workers' compensation system." 177 Mich. App. at 503.

The *Marsh* and *Kenyon* rationale is persuasive. LSI had no workers compensation liability for Bright's injuries and should not be shielded from common-law liability. If Nanny is deemed to be the employee of Cargill, the immunity granted to Nanny under K.S.A. 1991 Supp. 44-501(b) as an "other employee of such employer" (Cargill as the principal) is personal to Nanny and does not immunize LSI from its vicarious liability for Nanny's negligence. The trial court did not err in denying LSI's motion for a directed verdict.

### K.S.A. 1991 Supp. 60-19a01—The $250,000 Cap

The jury awarded Bright $1,643,250 for pain and suffering and assessed fault to Cargill 60% and to LSI-Nanny 40%. The trial court determined LSI's share of the pain and suffering assessment to be $657,300 (40% of $1,643,250), and then reduced LSI's portion of the award to $250,000 under K.S.A. 1991 Supp. 60-19a01.

LSI reasons, relying on *Brown v. Keill*, 224 Kan. 195, 203-04, 580 P.2d 867 (1978), that it is only liable for 40% of the $250,000 limit for pain and suffering. In *Brown*, we held that the individual liability of each defendant for payment of damages will be based on proportionate fault. LSI asserts that under the trial court's interpretation of K.S.A. 1991 Supp. 60-19a01, Bright may be able

to collect an additional $250,000 for pain and suffering against Cargill, violating the statute which limits Bright's recovery at $250,000 from *all* defendants.

Bright argues that when the jury's verdict results in an award for pain and suffering in excess of the limit, K.S.A. 1991 Supp. 60-19a01(d) directs the trial court to enter judgment for the plaintiff for $250,000 *after* consideration of comparative negligence. Bright contends that LSI's share of the pain and suffering, as assessed by the jury, was $657,300; therefore, LSI is not being made to bear more than its fair share. Bright suggests that *if* in fact he collects the $250,000 from LSI, and *if* he wins an award for pain and suffering against Cargill, the courts of Kansas will insure that he recovers no more than the law allows.

K.S.A. 1991 Supp. 60-19a01 provides in pertinent part:

"(b) In any personal injury action, the total amount *recoverable* by each party from all defendants for all claims for pain and suffering shall not exceed a sum total of $250,000.

. . . .

"(d) If a personal injury action is tried to a jury, the court shall not instruct the jury on the limitations of this section. If the verdict results in an award for pain and suffering which exceeds the limit of this section, the court shall enter judgment for $250,000 for all the party's claims for pain and suffering. *Such entry of judgment by the court shall occur after consideration of comparative negligence principles in K.S.A. 60-258a and amendments thereto.*" (Emphasis added.)

The fundamental rule of statutory construction is that the intent of the legislature controls. When construing a statute, a court should give words in common usage their natural and ordinary meaning. *Hill v. Hill,* 13 Kan. App. 2d 107, 108, 763 P.2d 640 (1988).

Bright relies on a wrongful death case, *McCart v. Muir,* 230 Kan. 618, 641 P.2d 384 (1982). In *McCart,* we interpreted the version of K.S.A. 60-1903 effective July 1, 1975, which provided:

" 'In any [wrongful death] action, the court or jury may award such damages as are found to be fair and just under all the facts and circumstances, but the damages, other than pecuniary loss sustained by an heir at law, cannot exceed in the aggregate the sum of twenty-five thousand dollars ($25,000) and costs.' " 230 Kan. at 625.

*McCart* held that the percentage of causal fault attributable to decedent's negligence plus percentage of additional causal fault

attributable to any direct negligence of plaintiff should be deducted from the amount of damages awarded rather than from the statutory limit allowable under 60-1903.

LSI contends that the reasoning of *McCart* involved the consideration of comparable fault attributed to the *plaintiff*. In the case at bar, LSI asserts, the issue is the comparable fault of *codefendants*.

At the time the trial court applied K.S.A. 1991 Supp. 60-19a01, LSI was the only defendant. LSI mischaracterizes Cargill as a codefendant.

Under K.S.A. 1991 Supp. 60-19a01, the $250,000 limit on pain and suffering is a limit on the amount *recoverable*. Subsection (d) clearly instructs the trial court to apply comparative fault principles before entering judgment for $250,000 for pain and suffering. This is what the trial court did. The trial court did not err in its application of K.S.A. 1991 Supp. 60-19a01 and in entering judgment against LSI for $250,000 for pain and suffering.

We affirm the judgment against LSI subject to a determination by the finder of fact that Cargill is Bright's statutory employer. We discuss that resolution in the closing portion of this opinion.

## Instructions On Remand

The trial court is to bifurcate the issues on remand. The case at bar presents two appeals. The first involves Cargill and Bright. The second relates to Bright and LSI.

We have reversed summary judgment for Cargill. On remand the status of Cargill with relation to Bright is to be established first. If Cargill is determined to be Bright's statutory employer, the judgment in favor of Bright against LSI is affirmed. If Cargill is determined not to be Bright's statutory employer, we reverse the judgment in favor of Bright against LSI and order a new trial on all issues.

A determination by the finder of fact that Cargill is not Bright's statutory employer leaves no option but to grant a new trial. Although the jury apportioned fault at 60% to Cargill and 40% to LSI, Cargill was in the case for fault comparison only. Cargill was not a real party in interest. Bright could not recover against Cargill. We recently considered a similar procedural scenario in

*Pizel v. Zuspann,* 247 Kan. 54, 77, 795 P.2d 42 (1990). See *Turnbull v. Byram,* 235 Kan. 891, 899, 684 P.2d 429 (1984).

In the case at bar, Cargill was characterized by the trial court in its summary judgment ruling to be Bright's statutory employer and, consequently, immune from suit under K.S.A. 1991 Supp. 44-501. LSI was the sole defendant. Cargill did not present evidence, cross-examine witnesses, or argue its case to the court and jury. We surmise that the trial strategy of all parties would not have been the same had Cargill been denied summary judgment. We do not speculate as to what effect a change in Cargill's status as a party defendant would have had or may have on apportionment of fault by a jury.

The chemistry in the courtroom may be altered with an alteration of the litigant formula. The litigant formula during the next trial involving Bright, Cargill, and LSI, if there is one, will carry the varied advocacy nuances of tri-party litigation.

All of the issues raised by LSI in the instant appeal will feel the impact of Cargill's presence as a real party defendant. Any new party relationship on remand will present counsel and the trial court with legal positions to be advanced and rulings, when required, upon proper presentation of those positions. Only the future will determine what the party positions will be and what trial court rulings will be necessary.

Affirmed in part, reversed in part, and remanded with instructions.

ABBOTT, J., not participating.

TERRY L. BULLOCK, District Judge, assigned.