ST. FRANCIS REGIONAL MEDICAL CENTER, INC., Plaintiff,

v.

CRITICAL CARE, INC., Flying Nurses, Inc., and Mary Ann Foster, Defendants;

and

FLYING NURSES, INC., Third Party Plaintiff,

v.

Sandra K. STERLING a/k/a Sandy Sterling Third Party Defendant.

No. 94–1398–MLB.

United States District Court, D. Kansas.

Oct. 14, 1997.

1416

Steven C. Day, Woodard, Blaylock, Hernandez, Roth & Day, Wichita, KS, for St Francis Regional Medical Center.

Larry B. Spikes, Kathryn Gardner, Martin, Pringle, Oliver, Wallace & Swartz, L.L.P., Wichita, KS, Jana V. Richards, Blackwell, Sanders, Matheny, Weary & Lombardi L.L.P., Overland Park, KS, for Critical Care, Inc.

Eric B. Metz, Jeffery C. Dahlgren, Triplett, Woolf & Garretson, L.L.C., Nancy J. Strouse, Wichita, KS, for Flying Nurses, Inc.

Anne M. Hull, Turner & Boisseau, Chartered, Wichita, KS, Peter G. Collins, Wallace, Saunders, Austin, Brown & Enochs, Chartered, Wichita, KS, Brian C. Wright, Turner & Boisseau, Chartered, Great Bend, KS, for Mary Ann Foster.

Larry B. Spikes, Martin, Pringle, Oliver, Wallace & Swartz, L.L.P., Wichita, KS, Jana V. Richards, Blackwell, Sanders, Matheny, Weary & Lombardi, L.L.P., Overland Park, KS, for Sandra K. Sterling.

*MEMORANDUM AND ORDER*

BELOT, District Judge.

This matter comes before the court on motions for summary judgment filed by three defendants: Critical Care, Inc. ("CCI") (Doc. 71), Flying Nurses, Inc. ("FNI") (Doc. 73), and Mary Ann Foster ("Foster") (Doc. 75). Plaintiff St. Francis Regional Medical Center, Inc. ("St.Francis") opposes the motions, and has filed a consolidated response (Doc. 78). Defendants have supported their motions with memoranda and reply briefs (CCI: Docs. 72 & 86; FNI: 74 & 83; Foster: 75 & 87). St. Francis has filed a sur-reply (Doc. 88).

On October 6, 1997, the court conducted a limited hearing on the summary judgment motions. The court heard argument limited to the following five issues:

1. How does St. Francis' negligence claim against Foster differ from its indemnity claim against her?

2. Upon what duty is St. Francis' negligence claim against Foster based?

3. Does St. Francis believe that its implied indemnity claim against CCI and FNI is implied in fact or implied in law or both?

4. Does Texas law govern the issue of successor liability, and if so, why?

5. What is the legal test for determining where and when a transfer of assets occurred?

In advance of the hearing and with leave of court FNI filed a Supplemental Brief on Summary Judgment Issues (Doc. 89). At the hearing the court granted the parties permission to file any new or additional authority they wished the court to consider. Accordingly, St. Francis, FNI and Foster each filed additional authorities in letter form.[1]

Upon due consideration and for the reasons set forth in this Memorandum and Order, CCI's and FNI's motions for summary judgment (Docs. 71 & 73) shall be granted in part and denied in part. Foster's motion (Doc. 75) shall be denied. As a result, judgment shall be entered for CCI and FNI on St. Francis' first and second causes of action. St. Francis' fourth cause of action shall be dismissed with prejudice. The remaining claims, cross-claims, and third-party claims will be resolved by a jury trial.

## I. TABLE OF CONTENTS

I. TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1419

II. NATURE OF CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1420

III. STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1420

IV. STANDARDS FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 1425

V. ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1425

 A. APPLICABLE LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1426

 B. FIRST CAUSE OF ACTION: RESPONDEAT SUPERIOR LIABILITY OF CCI BECAUSE FOSTER NEGLIGENTLY PERFORMED DUTIES OWED TO ST. FRANCIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1426

 C. SECOND AND FIFTH CAUSES OF ACTION: IMPLIED INDEMNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1426

 1. *Second Cause of Action: Implied Indemnity Against CCI and FNI* . . . . 1427

 a. Equitable Estoppel to Deny Liability . . . . . . . . . . . . . . . . . . . . . . 1427

 b. Implying a Contract of Indemnity . . . . . . . . . . . . . . . . . . . . . . . . 1428

---

1. The letters will be filed of record.

c. Failure to State an Indemnity Claim ............................1429

 i. Indemnity Between Joint Tortfeasors at Common Law .........1429

 ii. Impact of Adoption of Comparative Fault .....................1430

2. *Fifth Cause of Action: Implied Indemnity Against Foster*............1431

D. LACK OF CORPORATE CAPACITY TO BE SUED .....................1433

E. SUCCESSOR LIABILITY ........................................1435

1. *Choice–of–Law* ............................................1436

2. *Equitable Estoppel* ..........................................1437

F. EQUITABLE DEFENSES: WAIVER, ESTOPPEL, AND LACHES ......1438

1. *Waiver* ..................................................1438

2. *Equitable Estoppel* ..........................................1439

3. *Laches* ..................................................1439

VI. *CONCLUSION* ....................................................1439

## II. NATURE OF CASE

As explained more fully below, CCI was a corporation that provided temporary nurses for St. Francis' hospital; one of those nurses was Foster. Foster participated in the post-operative care of Donna Squier, one of St. Francis' patients. After the treatment of Squier, FNI purchased substantially all of the assets of CCI in a transaction that has been called alternatively an asset purchase and a merger.

Squier brought a medical malpractice claim against St. Francis, predicated in part on Foster's care. St. Francis settled its share of Squier's claim for $625,000. In this diversity suit, St. Francis seeks to recoup its settlement from the defendants. This court has jurisdiction under 28 U.S.C. § 1332(a).

**2.** While admitting that CCI dissolved on June 28, 1991 by operation of Colorado law, St. Francis argues that CCI retains the capacity to be sued in this case. This is discussed on pages 1433–1435.

**3.** Sterling was formerly known as Sandra K. Feldman. The third-party complaint filed by

## III. STATEMENT OF FACTS

The material facts are not in dispute. To aid readability, they are presented topically and, generally, chronologically.

For purposes of this lawsuit, St. Francis is a Kansas corporation operating a hospital in Wichita, Kansas. FNI is a Texas corporation in the business of providing a full range of temporary nursing services.

CCI was a Colorado corporation in existence from July, 1978, to June 28, 1991, when it dissolved.[2] Its principal place of business was in Denver. It was in the business of providing hospitals with temporary nurses to fulfill staffing needs. CCI supplied nurses for all purposes, but specialized in critical care nurses. Third party defendant Sandra K. Sterling[3] was the owner and chief executive officer of CCI. As discussed more fully below, in March 1991 FNI purchased substantially all the assets of CCI.[4]

FNI seeks indemnity against Sterling for any sums FNI may be required to pay St. Francis (Doc. 50). FNI has filed similar cross-claims against CCI and Foster (Doc. 49 at 5–7).

**4.** To the extent it is relevant to this order, whether the transaction legally effected a merger or an asset-purchase is discussed on pages 1434–1435.

### The Staffing Contract

On August 5, 1988, CCI and St. Francis executed a contract ("Staffing Contract") under which CCI was to provide temporary registered nurses to St. Francis (Doc. 79, Depo.Ex. 2). CCI agreed to provide St. Francis with a completed application, a skills checklist, a list of references, a copy of state nursing licensure, proof of a recent negative tuberculosis test, and a telephone interview for each registered nurse prior to commencement of temporary employment. Additionally, CCI had to verify that each registered nurse had at least one year of nursing experience.

Under the Staffing Contract, the temporary nurses were to "work at the Hospital for a minimum period of thirteen (13) weeks, but shall at all times remain employed by CCI." (Doc. 79, Depo.Ex. 2, ¶ 2.) CCI paid the nurses, withheld appropriate taxes, paid unemployment insurance, provided workers compensation, made a group health insurance plan available to the nurses, arranged for transportation from the nurses' home towns to Wichita, and provided local housing. Discipline of these nurses was an obligation of CCI. The Staffing Contract specifically provided that CCI would terminate or relocate nurses whose performance was unsatisfactory to St. Francis.[5]

St. Francis was responsible for providing to each registered nurse that it received from CCI, upon arrival, an adequate orientation to the hospital and to each unit where the nurse would work. In practice, these nurses reported directly to the nursing manager. Upon assignment to a unit, the nurses received unit-specific orientation, which informed them of the location of supplies and familiarized them with patient rooms, coworkers, and the type of equipment used at St. Francis.[6]

Permanent staff nurses hired by St. Francis each participated in orientation sessions provided by St. Francis' Human Resources Department. They also received employee handbooks, describing the nurses' general rights and duties as hospital employees. Temporary nurses received neither of these advantages.

During the negotiations over the Staffing Contract, St. Francis was aware of a CCI advertisement in *The American Journal of Nursing* which represented that CCI provided medical malpractice insurance for its temporary nurses. The Staffing Contract required CCI to maintain professional and general liability insurance for each nurse supplied. Although the Staffing Contract did not specify a minimum dollar amount of coverage, during contract negotiations CCI agreed to provide coverage in the amount of $1,000,000/3,000,000.[7] In turn, CCI required its nurses to maintain their own professional liability insurance policies. For the year running from December 14, 1989, to December 14, 1990, CCI obtained its general liability policy from Essex Insurance Company.

Foster was one of the temporary nurses provided by CCI to St. Francis. She was a registered nurse licensed in Illinois. She worked at St. Francis from January 8 to April 8, 1990. Foster had her own professional liability insurance policy through Capitol Indemnity Corporation. CCI believed that the Capitol Indemnity policy met the professional liability insurance requirement of the Staffing Contract. CCI provided St.

---

**5.** Foster argues that the contract provisions are not dispositive of whether the temporary registered nurses were employees of St. Francis in the eyes of the law.

CCI contends, without citation to the record, that discipline was not the sole obligation of CCI.

FNI controverts St. Francis' statement of facts with respect to the responsibility of CCI for the discipline of temporary nurses, citing portions of the record, but fails to explain how the record controverts the statements.

None of these controversies appears to be material or relevant to the motions for summary judgment.

**6.** In her reply (Doc. 87 at 3), Foster claims her orientation to the orthopedic unit at St. Francis also included instruction on St. Francis' nursing protocols.

**7.** Without voicing any evidentiary objection, CCI and FNI state that they do not controvert that Ray Rancuret testified (1) that St. Francis was aware of the advertisement, and (2) that CCI orally agreed to provide $1,000,000/3,000,000 in professional liability insurance. The implication is that they nonetheless controvert Rancuret's assertions, which are the facts advanced by St. Francis. Summary judgment movants cannot controvert facts in this manner.

Francis with a copy of its and Foster's certificates of insurance. St. Francis found the certificates to be satisfactory.

### The Squier Litigation

While at St. Francis, Foster rendered post-operative care to Donna Squier following Squier's orthopedic surgery. Squier suffered severe and permanent mental and physical injuries as a result of the care and treatment she received at St. Francis. On July 23, 1990, Squier's guardian ad litem filed suit against numerous medical providers in Sedgwick County District Court.[8] The named defendants included Squier's treating physicians and St. Francis. Squier did not name CCI, FNI, and Foster.

St. Francis' liability was predicated on the conduct of three nurses with an emphasis on the conduct of Foster. The other two were permanent employees of St. Francis. In the course of the litigation each party produced all of the expert witness reports that it intended to use at trial. Squier's reports included opinions that all three of the nurses treating Squier breached the standard of care required of them.

In a letter dated January 23, 1991, St. Francis' Director of Risk Management, Ray Rancuret, notified Sterling of the Squier lawsuit and of the potential involvement of Foster (Doc. 79, Depo.Ex. 21). Rancuret asked Sterling to help locate Foster, to notify Foster of the litigation, and to send him a copy of Foster's personnel file. In turn, Sterling notified Foster. At this time St. Francis did not attempt to contact Essex Insurance or Capitol Indemnity, although it did ask CCI to do so. One of CCI's attorneys mailed notice of Squier's claims to the insurers in letters dated March 5, 1991 (Doc. 79, Depo. Exs. 23 & 23A).

In May of 1991, Rancuret and an attorney for St. Francis traveled to Foster's home in Sorento, Illinois. At that visit and for the first time St. Francis was able to obtain from Foster the details of her role in the care and treatment of Squier. This provided St. Francis with insight into the possible extent of Foster's negligence. Rancuret and St. Francis' attorney informed Foster that they represented St. Francis, not her.

On January 20, 1992, one of St. Francis' attorneys wrote a letter to Capitol Indemnity to inform the company of the potential claim based upon the care provided by Foster. In part the letter reads as follows:

> The lawsuit has now reached the point where we have been provided with expert witness reports from the Plaintiff. Included in these expert reports, are two reports which are specifically critical of the nursing care provided by Ms. Foster. Under the circumstances, it appears likely that a claim for nursing malpractice will at some point be asserted against Ms. Foster, either directly by Plaintiff or by way of an indemnity claim.

(Doc. 79, Depo.Ex. 37.) St. Francis, however, never requested a tender, nor demanded coverage, from either insurance carrier during the Squier lawsuit.

In response to the letter, Capitol Indemnity's counsel sent a letter to Foster on February 5, 1992, acknowledging notice of the claim through the January 20 letter from St. Francis (Doc. 79, Depo.Ex. 38). Capitol Indemnity indicated to Foster that it had received voluminous materials on the claim including a transcript of her August 21, 1991 deposition and her February 8, 1990 written statement. The company also stated that it had retained counsel to defend Foster under a reservation of rights.

On August 11, 1992, the named defendants in the Squier lawsuit settled Squier's claims for $3,075,000. St. Francis' share was $625,000. St. Francis' decision to settle was based in large part upon its perception of Foster's conduct. Be that as it may, the settlement relieved St. Francis and all of its agents and employees from all liability stemming from the care or treatment of Squier.[9] Pursuant

---

**8.** *Squier v. St. Francis Reg'l Med. Ctr.*, No. 90–C–2372 (18th Dist. July 23, 1990).

**9.** The release reads, in pertinent part, as follows:
FOR AND IN CONSIDERATION of the sum ... ($3,075,000), [Squier] hereby release [sic]

St. Francis Regional Medical Center, Inc.... from all claims and causes of action of every kind whatsoever that now exist or may hereafter arise on account of medical and hospital care and treatment provided to Squier ....

to the settlement, the district court dismissed with prejudice all claims against all parties.

### FNI's Acquisition of CCI

In late 1990, prior to the time St. Francis notified CCI of the Squier litigation, FNI approached CCI concerning a possible purchase of CCI by FNI. Negotiations began in January, 1991. Both sides were represented by counsel during these negotiations, which culminated in the execution of an agreement ("the Agreement") on March 21, 1991 (Doc. 79, Depo.Ex. 10).

Pursuant to the Agreement, CCI and a related company, Critical Care Employment, Inc. ("CCEI"), agreed to change their names to SK Sterling, Inc. and SK Sterling Employment, Inc., respectively, to transfer substantially all of their assets to FNI, to wind up their affairs, and to dissolve themselves by June 30, 1991. The Agreement also required CCI to purchase or maintain sufficient insurance to cover such "casualties, risks and contingencies" as may arise in the course of their business.

CCI and CCEI met each of their obligations under the Agreement. In order to meet the insurance requirement CCI held a policy covering all "occurrences" from 1986 through 1990. Squier's claim occurred in 1990. The transfer of assets occurred March 21, 1991.[10] Among the transferred assets were the trade name, Critical Care, Inc.,[11] and a list of CCI's hospital clients. CCI's independent business operations effectively ceased upon the transfer of its assets. CCI's final dissolution occurred on June 28, 1991.

In exchange for CCI's obligations under the Agreement, it was to receive 40,000 shares of FNI stock and FNI was to assume some of the liabilities of CCI. CCI ultimately received 31,500 shares, rather than 40,000, because of adjustments in CCI's assets and liabilities at the time of closing. The Agreement expressly stated that FNI would not assume the contingent liability of the Squier lawsuit.[12] Among the assumed liabilities were all of the liabilities related to the usual business operations of CCI, including the lease for CCI's office space in Denver. FNI continued to use the Denver office space, formerly used as CCI's headquarters, until the lease for that property expired in October of 1991.

By way of a separate contract executed concurrently with the Agreement, FNI agreed to retain Sterling as an employee for six-months. Sterling's employment with FNI terminated after the initial six-month period. Similarly, FNI initially retained all of CCI's employees, who continued to work out of the Denver office. FNI subsequently terminated some of these employees.

### Representations to St. Francis Regarding the CCI/FNI Transaction

The Agreement obligated the parties to comply with the Bulk Sales Law, which requires that bulk sale notices be given to certain persons. Accordingly, FNI's attorneys obtained from CCI a list of creditors in March of 1991, and sent each of these creditors a bulk sale notice. CCI also gave FNI's attorneys a copy of the letter Rancuret had sent to Sterling regarding the Squier lawsuit. As a result, FNI sent a copy of the bulk sale notice to Rancuret at St. Francis. FNI sent that notice by certified mail, return receipt requested. The unsigned return receipt demonstrates delivery on March 29, 1991. Although someone at St. Francis received the bulk sale notice mailed by FNI, Rancuret himself did not, and he was never apprized of the information it contained. Neither St. Francis nor its attorneys ever responded to the bulk sale notice. Finally, FNI filed a

---

5. The parties released, in addition to those named above, shall include all of their agents, employees, members, officers, directors, servants, successors, heirs, executors, administrators, insurers, and all other persons, firms, corporations, associations or partnerships.

**10.** It therefore appears that CCI ceased providing temporary nursing services on this date.

**11.** FNI registered its use of the trade name and expressed its intent to do business under it by filing a "Certificate of Assumed Trade Name" with Colorado's Secretary of State on April 10, 1991.

**12.** St. Francis denies that the exclusion language was legally effective. The court's discussion of successor liability begins at page 1435.

copy of the notice with the Colorado Secretary of State.

FNI sent two letters to each client hospital of CCI. One advised them of the transaction between FNI and CCI. It explained that the two companies had merged, that the owners of CCI and FNI would now be working together, that the two had pooled their resources, and that the result was a stronger company (Sterling Depo. at 87–88). The second letter, authored by FNI's attorneys, advised the hospitals that FNI would honor CCI's contracts with them, and that the transaction between CCI and FNI need not interrupt the business relationship between "Flying Nurses/Critical Care" and the hospital. The letter also said, "In essence, Flying Nurses *is* Critical Care, but with more resources and experience" (Doc. 79, Depo. Ex. 15 (emphasis original)). FNI was successful in maintaining business relationships with some of the CCI hospitals after the "merger."

On April 15, 1991, St. Francis received a letter from Sterling, writing on behalf of CCI, and Suzanne Anderson, writing on behalf of FNI. In the letter Sterling wrote, in part, "Effective April 1, 1991, Critical Care, Inc., the dynamic company which I started in 1978 merged with another great company, Flying Nurses, Inc., started by Suzanne Anderson, RN, BS, in 1980." The letter said that CCI and FNI were "teaming together" to provide better service for their hospital clients. The authors referred to the joining of CCI and FNI as a "partnership." In closing Sterling wrote that she and Anderson look forward to working with the hospital, and that Sterling and Anderson would be working together to make a smooth transition, to continue to grow, and to deliver the kind of service the hospital had come to expect (Doc. 79, Depo.Ex. 29).

Kathleen Bachman, Director of Human Resources at St. Francis, replied to FNI and advised them that she had received the merger letter, but that it should have been sent to her rather than the subordinate to whom it was directed (Doc. 79, Depo.Ex. 17). In response, FNI's vice-president, Ray Ortega, sent a follow-up letter to Bachman. The follow-up letter, dated April 25, 1991, indicated that FNI and CCI had recently "merged," acknowledged that the "merger notification" had been sent to Bachman's subordinate, and stated that FNI would mail a duplicate to Bachman if she had not received the original. There is no indication that Bachman made such a request.

Based on the April 15 and 25 letters, Bachman knew that FNI and CCI referred to their transaction as a merger. The transaction raised questions in her mind regarding the new company's title, billings, and office location. As a result, she contacted a member of St. Francis' legal staff with whom she discussed the nature of the FNI/CCI transaction and the fact that it had been described as a merger.

In April of 1991, St. Francis also considered whether it needed to request new or additional insurance policies from FNI. Based on Bachman's representations of the information she had received from FNI and CCI, Rancuret concluded that the FNI/CCI transaction was a merger.

On August 7, 1991, the parties to the Squier litigation deposed Sterling, who was then an employee of FNI. St. Francis' attorney attended. Sterling was represented by an attorney, who she believed Essex Insurance had hired. At her deposition Sterling characterized the transaction between CCI and FNI as a "merger."

*Filing of the Action and FNI's Demand for Coverage*

On August 11, 1994, St. Francis filed this suit against CCI, FNI, and Foster. St. Francis asserts causes of action for negligence, indemnity, and breach of contract, as more fully described below. It seeks to recover the $625,000 it paid pursuant to the settlement, plus prejudgment interest and the attorney fees it incurred in the Squier litigation.

On October 21, 1994, FNI's attorney contacted Tim Hughes of Essex Insurance, CCI's professional malpractice insurance carrier for 1990, and requested that Essex undertake the defense of the present action and assume responsibility for the payment of any judgment rendered against FNI. Essex de-

clined on the grounds that FNI was not a named insured under the policy and that CCI had not assigned the policy to FNI. FNI renewed its demand by letter on November 9, 1994, and Essex again declined.

## IV. STANDARDS FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure directs the entry of summary judgment in favor of the party who "shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986). The court's inquiry is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 213 (1986). "Entry of summary judgment is mandated, after an adequate time for discovery and upon motion, against a party who 'fails to make a showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Aldrich Enters., Inc. v. United States,* 938 F.2d 1134, 1138 (10th Cir.1991) (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552, 91 L.Ed.2d at 273). Summary judgment is inappropriate, however, if there is sufficient evidence on which a trier of fact could reasonably find for the non-moving party. *Prenalta Corp. v. Colorado Interstate Gas Co.,* 944 F.2d 677, 684 (1991).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact by informing the court of the basis for its motion. *Martin v. Nan-* *nie and the Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993). This burden, however, does not require the moving party to "support its motion with affidavits or other similar materials negating the opponent's claim." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553, 91 L.Ed.2d at 274. Once the moving party properly supports its motion, the non-moving party "may not rest upon the mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Muck v. United States,* 3 F.3d 1378, 1380 (10th Cir.1993). The court reviews the evidence in the light most favorable to the non-moving party, *e.g., Thrasher v. B & B Chem. Co.,* 2 F.3d 995, 996 (10th Cir.1993), under the substantive law and the evidentiary burden applicable to the particular claim. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2514, 91 L.Ed.2d at 216.

## V. ANALYSIS

St. Francis' First Amended Petition/Complaint (Doc. 20) sets forth five causes of action. The first three are directed at CCI and FNI. In its first cause of action St. Francis alleges that Foster, as an employee of CCI, was negligent in performing duties owed to St. Francis, and, therefore, that CCI is liable to St. Francis under the theory of respondeat superior. In its second cause of action, St. Francis asserts that there was an implied contract of indemnity between it and CCI with respect to the actions of temporary nurses, and therefore that CCI is liable to St. Francis for the liability St. Francis incurred as a result of Foster's actions. In its third cause of action, St. Francis alleges that CCI breached its contract by failing to purchase professional liability insurance for Foster. St. Francis alleges that FNI is liable on these three claims as the successor to CCI.[13]

St. Francis directs its final two causes of action at Foster. The fourth cause of action alleges negligence against Foster in the performance of duties she owed to St. Francis.[14]

---

**13.** Because CCI's liability is a predicate to FNI's liability, FNI will be separately discussed only when its separate status has particular relevance.

**14.** Although Foster did not seek summary judgment on St. Francis' negligence claim, the court asked St. Francis to identify the duty Foster owed to St. Francis and to distinguish between its negligence and indemnity claims against Foster. St. Francis thereupon abandoned that cause of action.

The final cause of action is a straight implied indemnity claim against her.

Each defendant claims that they cannot be held liable under any theory of implied indemnity. In addition, CCI claims that Federal Rule of Civil Procedure 17(b) and Colorado law bar suit against it because CCI was dissolved more than two years before St. Francis filed this action. FNI argues that St. Francis' cause of action predicated on respondeat superior is not cognizable in the law. It also claims that there is no basis for imposing successor liability against it. Additionally, FNI argues that St. Francis' claims are barred by waiver, estoppel, and laches. Each argument will be considered in turn.

## A. APPLICABLE LAW

■ "[A] federal court sitting in diversity must apply the substantive law of the state in which it sits, including the forum state's choice-of-law rules." *Boyd Rosene & Assocs., Inc. v. Kansas Municipal Gas Agency,* 123 F.3d 1351, 1352–53 (10th Cir.1997). Because this court is sitting in diversity, Kansas law applies. This court must interpret Kansas law as it believes the Kansas Supreme Court would. *Allen v. Minnstar, Inc.,* 8 F.3d 1470, 1476 (10th Cir.1993). Accordingly, this court follows precedent from Kansas appellate courts, absent persuasive indication that the Kansas Supreme Court would resolve the issue differently if faced with it today. *Gant v. Gant,* 1994 WL 410633, at \*4, 30 F.3d 141 (10th Cir.1994) (unpublished table decision).

## B. FIRST CAUSE OF ACTION: RESPONDEAT SUPERIOR LIABILITY OF CCI BECAUSE FOSTER NEGLIGENTLY PERFORMED DUTIES OWED TO ST. FRANCIS

FNI has challenged the existence of St. Francis' first cause of action, the essence of which is that a special employer may sue a general employer under a theory of respondeat superior based on the employee's breach of duties she owed *to the special employer.* FNI asserts that the purported cause of action simply does not exist (Doc. 74 at 29).

A party has the obligation to demonstrate that its cause of action exists. St. Francis failed to respond to FNI's argument, and therefore failed to cite any case recognizing this cause of action. The court itself spent several hours hunting for a case on either side of the issue and found only one. In *St. Johnsbury and Lamoille County R.R. v. Canadian Pac. Ry. Co.,* 341 F.Supp. 1368, 1372 (D.Vt.1972), the court wrote, "one of the long-established principles relating to the joint employee relationship is that one employer of a joint employee is not liable in respondeat superior to another employer of this joint employee for the negligence of the joint employee." [15] Because St. Francis has failed to demonstrate a legal basis for its first cause of action, FNI's motion for summary judgment must be granted in relevant part. As a result, CCI and FNI are entitled to judgment on St. Francis' first cause of action.

## C. SECOND AND FIFTH CAUSES OF ACTION: IMPLIED INDEMNITY

■ In its second and fifth causes of action, St. Francis raises claims of implied indemnity. Foster, CCI, and FNI argue that St. Francis cannot state such a claim. In Kansas, a contract of indemnity may be express or implied. *Kennedy v. City of Sawyer,* 228 Kan. 439, 455, 618 P.2d 788 (1980); *Haysville U.S.D. No. 261 v. GAF Corp.,* 233 Kan. 635, 642, 666 P.2d 192 (1983). St. Francis has not asserted an express contractual claim of indemnity. [16]

**15.** The court also noted that Vermont's then recent adoption of comparative fault could impact that rule, but the case before the court had arisen prior to that adoption, leaving the court with no occasion to address the issue.

**16.** The court has reviewed the Staffing Contract (Doc. 79, Depo.Ex. 2) and has found no basis for such a claim. Moreover, the Staffing Contract itself may preclude St. Francis' implied indemnity claim against CCI and FNI. While St. Francis has referred to implied indemnity as a right, it is nothing more than an implied contract. There is no indication that the formation of the alleged indemnity contract occurred outside or after negotiations for the Staffing Contract. Thus, the Staffing Contract, which contains a merger clause (Doc. 79, Depo. Ex. 2 ¶ 9), would appear to foreclose any argument that an implied indemnity contract exists. The court notes, however, that it has made no ruling on this issue.

In contract cases, the law of the place where the contract was made governs the construction of the contract. *Neumer v. Yellow Freight Sys., Inc.*, 220 Kan. 607, Syl. ¶ 2, 608, 556 P.2d 202, 204 (1976); *Gillespie v. Seymour*, 19 Kan.App.2d 754, 763, 876 P.2d 193, 200 (1994). The parties concede that Kansas law governs St. Francis' implied indemnity claims.

"A contract of indemnity may be implied when one is compelled to pay what another party ought to pay." *Kennedy*, 228 Kan. at 455, 618 P.2d 788. The indemnity contract is implied between the person made to pay and the person whose tortious acts created the liability. *Russell v. Community Hosp. Ass'n*, 199 Kan. 251, 255–56, 428 P.2d 783, 787 (1967) (quoting Am.Jur. *Indemnity* § 18); 41 Am.Jur.2d *Indemnity* § 1 (1995) ("The right to indemnity stands upon the principle that everyone is responsible for the consequences of his own negligence, and if another person has been compelled to pay the damages which ought to have been paid by the wrongdoer, they may be recovered from him. Indemnity requires full reimbursement, and transfers liability from the one who has been compelled to pay damages to another who should bear the entire loss.").

### 1. *Second Cause of Action: Implied Indemnity Against CCI and FNI*

St. Francis claims that implicit in the relationship created by the Staffing Contract was a contract of indemnity between it and CCI (Doc. 78 at 29–31). St. Francis says that while the law allowed Squier to proceed against either CCI, St. Francis, or both, to recover the damages she suffered as a result of Foster's alleged negligence, as between CCI and St. Francis the entire liability should fall upon CCI. In support of this argument St. Francis cites to the fact that the Staffing Contract declared that Foster would remain employed by CCI and required CCI to furnish professional liability insurance (Doc. 78 at 29–32).

#### a. *Equitable Estoppel to Deny Liability*

St. Francis argues that CCI should be "estopped from denying that it must indemnify St. Francis for Foster's negligence" (Doc. 78 at 31). As authority for its position, St. Francis cites to several cases setting forth or applying the doctrine of equitable estoppel. *See Mohr v. State Bank*, 241 Kan. 42, 49, 734 P.2d 1071 (1987); *Bowen v. Westerhaus*, 224 Kan. 42, 45–46, 578 P.2d 1102 (1978); *Coffey v. Stephens*, 3 Kan.App.2d 596, 599–600, 599 P.2d 310 (1979); *Petroleum Prods., Inc. v. Total Petroleum, Inc.*, 795 F.Supp. 356, 361 (D.Kan.1992) (Theis, J.), *aff'd*, 986 F.2d 1428, 1993 WL 34753 (10th Cir.1993); *Browning v. Lefevre*, 191 Kan. 397, 400, 381 P.2d 524 (1963); *Thompson v. Anderson*, 209 Kan. 547, 556, 498 P.2d 1 (1972); *Pattison v. State Farm Fire & Cas. Co.*, 209 Kan. 167, 495 P.2d 975 (1972). Upon review of these cases, the court finds them to be consistent with more recent Kansas case law.

"Equitable estoppel is the effect of the voluntary conduct of a party whereby it is precluded, both at law and in equity, from asserting rights against another person relying on such conduct." *Gillespie v. Seymour*, 250 Kan. 123, 129, 823 P.2d 782 (1991). In *Tucker v. Hugoton Energy Corp.*, 253 Kan. at 383, 855 P.2d 929, the court stated:

"A party seeking to invoke equitable estoppel must show that the acts ... or silence of another party (when it had a duty to speak) induced the first party to believe certain facts existed. There must also be a showing the first party rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts. There can be no equitable estoppel if any essential element thereof is lacking or is not satisfactorily proved. Estoppel will not be deemed to arise from facts which are ambiguous and subject to more than one construction. *Gillespie v. Seymour*, 250 Kan. 123, 129–30, 823 P.2d 782 (1991); *Ram Co. v. Estate of Kobbeman*, 236 Kan. 751, 766, 696 P.2d 936 (1985)."

*Toshiba Master Lease, Ltd. v. Ottawa Univ.*, 23 Kan.App.2d 129, 134–35, 927 P.2d 967, 972 (1996). "To invoke the doctrine of equitable estoppel, a party need not have 'planned or contrived with the deliberate intent to lull [the opposing party] into a false sense of

security.'" *Ferrell v. Ferrell,* 11 Kan.App.2d 228, 234, 719 P.2d 1, 5 (1986) (quoting *Coffey,* 3 Kan.App.2d at 600, 599 P.2d 310).

The acts and representations at issue here appear to be uncontroverted. St. Francis points to two provisions in the Staffing Contract (Doc. 78 at 31–32). The first required CCI to provide "professional liability insurance and general liability insurance for each RN" (Doc. 79, Depo. Ex. 2 ¶ 2). The second was the declaration that the temporary nurses "shall at all times remain employed by CCI" (*id.*). However, St. Francis fails either to explain or to produce evidence regarding what these representations induced it to believe with respect to liability or indemnification, or how St. Francis relied and acted upon that belief to its detriment (Doc. 78 at 31–34). Instead, St. Francis merely argues the existence of an implied indemnity agreement from the Staffing Contract alone:

> [The Staffing Contract] shows that St. Francis and CCI, as between themselves, intended for CCI to be treated as Foster's employer, and CCI, as Foster's employer, accepted payment from St. Francis for her temporary services. CCI cannot now be allowed to take a position inconsistent with what it agreed to in its contracts with St. Francis and Foster by denying responsibility for Foster's conduct. Thus, CCI is estopped from denying vicarious liability for her negligence.

(Doc. 78 at 32.) "Kansas law is very clear— equitable estoppel does not arise out of contract but is based upon concepts of morality and justice." *Toshiba Master Lease, Ltd.,* 23 Kan.App.2d at 135, 927 P.2d at 972.

Without belaboring the point, it is clear that Foster was an employee of both CCI and St. Francis.[17] The court simply does not read the two contractual provisions as an implicit representation that CCI would indemnify St. Francis for any negligence of temporary nurses such as Foster. Even if the court could construe the provisions as ambiguous on this issue, St. Francis would not be entitled to take the issue to a jury, because "[e]stoppel will not be deemed to arise from facts which are ambiguous and subject to more than one construction." *See Toshiba Master Lease Ltd.,* 23 Kan.App.2d at 135, 927 P.2d at 972. Therefore, the court rejects St. Francis' claim that CCI is equitably estopped from denying that it is liable to St. Francis for Foster's negligence.

### b. *Implying a Contract of Indemnity*

Before wending down the tortured path of the parties' substantive arguments, the court finds it helpful to consider the facts of this case in light of the first principles of implied indemnity law. Indemnity may be implied in fact or by law. *Kennedy,* 228 Kan. at 455, 618 P.2d 788. In its brief, St. Francis does not specify whether it is arguing that its contract of indemnity is implied from the particular facts surrounding its relationship with CCI or is implied as a matter of law from the general employer-special employer relationship. At oral argument, St. Francis argued both.

"A contract implied in fact arises from facts and circumstances showing mutual *intent* to contract." *Mai v. Youtsey,* 231 Kan. 419, 422, 646 P.2d 475 (1982) (emphasis original). St. Francis has cited only three facts: (1) it was Foster's special employer, while CCI was her general employer; (2) the Staffing Contract declared that CCI would remain the employer of temporary nurses assigned to St. Francis; and, (3) the Staffing Contract required CCI to maintain liability insurance covering Foster's actions. Construed in the light most favorable to St. Francis, the court finds these factors, standing alone, insufficient to raise an inference that CCI and St. Francis had a *mutual intent* to create an indemnity contract. When

---

17. CCI implies that it is an open question whether Foster was its employee and whether it is vicariously liable for her alleged negligence (Doc. 83 at 13). For purposes of summary judgment, the court must view CCI as a dual employer with vicarious liability.

While it is uncontroverted that CCI was to act as the employer for purposes of discharging administrative functions, such as payroll deductions, it is equally clear that St. Francis had day to day control over Foster while she was assigned to the hospital. While St. Francis could not discharge Foster from CCI's employment, it could discharge her from its employment for unsatisfactory performance.

viewed in context with other circumstances, including that CCI and St. Francis negotiated the Staffing Contract in an arms length transaction, that CCI never told St. Francis, even informally, that it would cover St. Francis for any liability arising from the employment of CCI's nurses, and that the Staffing Contract contains a complete integration clause (Doc. 79, Ex. 2, ¶ 9), St. Francis' argument that an indemnity agreement was implied in fact becomes untenable.

St. Francis is no more successful with its implied in law argument. "A contract implied in law, or quasi contract, exists regardless of assent. It is a fiction of the law designed to prevent unjust enrichment." *Mai,* 231 Kan. at 422, 646 P.2d 475. Indemnity will be implied only when public policy and justice dictate that responsibility for the payment of damages be shifted entirely from one party to another. *Symons v. Mueller Co.,* 526 F.2d 13, 17 (10th Cir.1975). "[I]ndemnification must be rationally justified upon equitable considerations." *Id.* (quoting *Security Ins. Co. v. Johnson,* 276 F.2d 182, 185 (10th Cir.1960)). St. Francis has not identified any public policy considerations that would justify an equitable shift of responsibility for Squier's damages to CCI.

St. Francis is a large, sophisticated business that was fully capable of appreciating the risks involved in nursing care, whether administered by its regular employees or by its temporary employees. Either through self-insurance or a commercial policy St. Francis insured against the negligence of its permanent nurses. Presumably, it could have required CCI to have St. Francis named as an additional insured on the insurance policies procured by CCI and Foster or negotiated an express indemnity provision in the Staffing Contract. While public policy requires St. Francis to protect its patients and, if necessary, to answer in damages for the negligence of its employees, it is not concerned with St. Francis' ability to shift that responsibility to a dual employer who has no direct control over the negligent employee's acts or omissions. For these reasons, the court finds no basis in equity for St. Francis' indemnity claim against CCI and FNI.

### c. *Failure to State an Indemnity Claim*

Because the parties have focused so intently on other grounds for decision, the court returns to their arguments, despite the foregoing rulings. CCI and FNI vigorously argue that St. Francis cannot state a claim for implied indemnity against them (Doc. 72 at 9–17; Doc. 74 at 26–33). They argue that Kansas' adoption of comparative fault has resulted in the abolition of the doctrine of implied indemnity.[18] St. Francis disputes the effect of the adoption of comparative fault and criticizes the cases relied upon by CCI and FNI (Doc. 78 at 21–31).

### i. *Indemnity Between Joint Tortfeasors at Common Law*

St. Francis has not cited any Kansas case that approves of implied indemnity claims between dual employers. FNI points out that, as a matter of law, both a special and a general employer may be held vicariously liable for the actions of an employee under the doctrine of respondeat superior (Doc. 74 at 27).[19] *See Bright v. Cargill, Inc.,* 251 Kan. 387, 406, 837 P.2d 348 (1992). As a result, they are joint tortfeasors. Prior to the adoption of comparative fault, one joint tortfeasor could seek neither contribution nor indemnity from another unless the two were "not in pari delicto and their negligence is substantially different, not merely in degree but in character." *Russell v. Community Hosp. Ass'n,* 199 Kan. 251, Syl. ¶ 2, 255–56, 428 P.2d 783, 787 (1967). The imputed negligence of the special employer, in this case St. Francis, is identical to that of the general employer, CCI, with respect to the conduct of the joint employee, Foster. Therefore, under Kansas law as it existed before the adoption of comparative fault, St. Francis would have been barred from seeking indemnity from CCI for any sums paid to Squier.[20]

---

18. The court notes that CCI's and FNI's arguments are only applicable to indemnity claims implied in law.

19. St. Francis concedes this point (Doc. 78 at 29).

20. This accords with the traditional notion that indemnity arises only between the person made

*See also St. Johnsbury & Lamoille County R.R.*, 341 F.Supp. at 1372. Thus, in order for St. Francis to recover, Kansas' adoption of comparative fault must have changed this result. St. Francis, however, never puts forward any theory of the effect of the adoption of comparative fault that is favorable to its position.

### ii. *Impact of Adoption of Comparative Fault*

*Ellis v. Union Pac. R.R. Co.*, 231 Kan. 182, 643 P.2d 158, *aff'd on reh'g*, 232 Kan. 194, 653 P.2d 816 (1982), and *Teepak, Inc. v. Learned*, 237 Kan. 320, 699 P.2d 35 (1985), analyze the effect of the adoption of comparative fault on contribution.[21] CCI and FNI believe those cases preclude St. Francis' implied indemnity claim.

■ With the advent of comparative fault, defendants could compel in one action a comparison of fault among all tortfeasors, and one tortfeasor could no longer be held liable for the fault of others. As a result, "[t]he equitable need for contribution vanishe[d]," and the Kansas Supreme Court abolished it. *Teepak*, 237 Kan. at 325, 699 P.2d at 40. Consequently, when a defendant participates in a settlement which operates as a full release of any and all claims the plaintiff may have had, the defendant may not compel concurrent or successive tortfeasors against whom the plaintiff filed no claims to contribute to the settlement. *Id.* at 326, 699 P.2d at 40.

■ At least in a contribution or proportional fault context, this court reads *Ellis* and *Teepak* to bar lawsuits between concurrent or successive tortfeasors when (1) an injured party has previously sued one tortfeasor, but not others, (2) that tortfeasor has settled with the injured party, (3) the injured party has given a full release of all claims held by it, and (4) the settling tortfeasor claims the other tortfeasors caused all or part of the injured party's damages.

St. Francis counters that *Ellis* and *Teepak* have been discredited (Doc. 78 at 23–27). St. Francis claims that the holdings in those cases were based on an outdated conception of the "one action rule," which has been modified and is now known as the "one trial rule." It claims that while the one action rule as announced in *Ellis* and *Teepak* may have prohibited this action, the modern one trial rule does not.[22] The court agrees with Foster (Doc. 87 at 10) that the Kansas Supreme Court did not decide *Ellis* and *Teepak* on the basis of the one action rule.[23] They

---

to pay and the individual whose tortious conduct created the liability. Because St. Francis paid for the tortious conduct of Foster, not CCI, indemnity should be implied between St. Francis and Foster, not St. Francis and CCI.

**21.** *Ellis* and *Teepak* have no application to negotiated contracts for indemnity, *see Southwest Nat'l Bank v. Simpson & Son, Inc.*, 14 Kan. App.2d 763, 772–74, 799 P.2d 512 (1990) (permitting a party to enforce contractual indemnity claim following a comparative fault trial in which the finder of fact attributed fault to that party).

**22.** CCI does claim that the one action rule bars St. Francis' indemnity claim against it (Doc. 72 at 11–13). CCI does not, however, rely on *Ellis* and *Teepak* for this argument. Instead, CCI relies on *Brown v. Keill*, 224 Kan. 195, 207, 580 P.2d 867 (1978), and "*Albertson v. Volkswagenwerk Aktiengesellschaft*, 230 Kan. 368, 634 P.2d 1127 (1981)." Based on the authorities discussed in this section of St. Francis' brief, the court holds that CCI's argument is without merit.

**23.** The *Teepak* court noted that the adoption of comparative fault in Kansas resulted in the aboli-

tion of the contribution cause of action because one tortfeasor can no longer be held liable for the fault of another. 237 Kan. at 325, 699 P.2d at 39–40 (quoting *Brown v. Keill*, 224 Kan. 195, 203–04, 580 P.2d 867 (1978)); *see Chavez v. Markham*, 256 Kan. 859, 866, 889 P.2d 122, 126–27 (1995). *After* announcing its decision and offering its rationale, the court wrote, "Before concluding, it should be noted that the result reached herein is wholly consistent with the philosophy, as expressed in *Albertson v. Volkswagenwerk Aktiengesellschaft*, 230 Kan. 368, 634 P.2d 1127 (1981), that comparative fault should be determined in one action." 237 Kan. at 328–29, 699 P.2d at 42. At most, the court set forth an alternative holding based on the one action rule.

Moreover, the cases cited by St. Francis in no way affect the holdings of *Ellis* and *Teepak*. In *Ellis* and *Teepak* the plaintiffs in the first cases were the only injured parties. The settlements they executed released all parties, including both the plaintiffs and defendants in the subsequent case, of their liability to the injured party. Pursuant to the settlements, the trial courts dismissed the plaintiffs' claims. In essence, the plaintiffs in the subsequent lawsuits (defendants in the first lawsuit) sought a comparison of fault

remain good law.[24] The question remains whether their analysis is equally applicable to indemnity actions.[25] It is unnecessary, however, for the court to resolve that question.

 Assuming without deciding that Kansas would recognize an implied indemnity claim between dual employers whose liability is premised on respondeat superior (St. Francis' position), and further assuming without deciding that *Ellis* and *Teepak* would apply to such a claim (CCI's position), St. Francis could have sought a determination of proportional respondeat superior liability in the Squier action and could not have been held liable for CCI's share. Because St. Francis' settlement with Squier fully released any and all claims that Squier may have had, St. Francis would not now be able to compel joint tortfeasors against whom Squier filed no claims, such as CCI, to contribute to the settlement.

On the other hand, if the adoption of comparative fault has not encompassed implied indemnity between dual employers which are jointly liable for an employee's negligence, then the common law rule barring contribution between joint tortfeasors applies. In either case, St. Francis' second cause of action fails. The court cannot accept the premise, implied in St. Francis' argument, that Kansas public policy would support an implied indemnity claim, which states, in effect, that CCI will be unjustly enriched unless St.

Francis is allowed to shift one hundred percent of its share of the Squier settlement to CCI. St. Francis has not advanced a single reason why this should be so. Accordingly, CCI's and FNI's motions for summary judgment (Docs. 71 & 73) shall be granted in relevant part.

### 2. *Fifth Cause of Action: Implied Indemnity Against Foster*

 Historically, indemnity implied in law has been allowed in two contexts: when the fault of one defendant may be characterized as active while another's is passive, or when a party personally without fault is made to pay for the tortious acts of another. *See Kennedy,* 228 Kan. at 455, 618 P.2d 788.[26] The classic example of implied indemnity is that which exists between an employer who has been held vicariously liable for the torts of its employee and the employee. *Bick v. Peat Marwick & Main,* 14 Kan.App.2d 699, 709, 799 P.2d 94 (1990); *Kennedy,* 228 Kan. at 455, 618 P.2d 788. Under the doctrine of respondeat superior the fault of the employee is imputed to the employer without requiring fault or knowledge on the part of the employer. *Major v. Castlegate, Inc.,* 23 Kan.App.2d 694, Syl. ¶ 1, 935 P.2d 225, 228 (1997); 27 Am.Jur.2d *Employment Relationship* § 459 (1996). The employer may recover from the employee because the employer has been made to pay for the employee's tortious acts.

upon the *injured party's* claim. The liability of the defendants in the second case was to the injured party (the plaintiff in the first action), not to the plaintiff in the second case. The one trial rule prohibits multiple trials by *the same plaintiff* for the same legal injury.

24. In recent years Kansas appellate courts have cited both *Ellis* and *Teepak* with approval on matters that go to the heart of those decisions. *See Maas v. Huxtable & Assocs., Inc.,* 23 Kan. App.2d 236, 242, 929 P.2d 780 (1996) (citing *Ellis* ); *Allied Mutual Ins. Co. v. Gordon,* 248 Kan. 715, 732, 811 P.2d 1112, 1123 (1991) (citing *Teepak* ).

25. In *Bright v. Cargill, Inc.,* the Kansas Supreme Court had the opportunity to decide whether the liability of general and special employers under the doctrine of respondeat superior ought to be apportioned *pursuant to Kansas'* comparative fault statute. 251 Kan. at 408, 837 P.2d 348. Because the general employer failed to raise the

issue before the trial court, the supreme court declined the opportunity. Thus, the district court's decision to apportion vicarious liability between the parties stood.

This court is doubtful of that approach. K.S.A. 60-258a(c) speaks in terms of comparative *negligence.* Kansas courts have interpreted the statute to encompass comparative *fault,* including strict liability claims, though they have ruled it inapplicable to intentional torts. In order to hold the statute applicable to the liability of dual employers, the courts would have to interpret it to encompass comparative *responsibility,* rather than fault, because (absent an independent allegation of negligence or the like) the only fault of the employers is derivative and identical.

26. Because Kansas has abolished implied indemnity based on the dichotomy of active and passive fault, *Kennedy,* 228 Kan. at Syl. ¶ 5, 618 P.2d 788, the court need not consider its application to the facts.

This is the essence of St. Francis' fifth cause of action.

Foster argues that St. Francis' indemnity claim against her fails (Doc. 75 at 7–11). First, she says that because indemnity is a one hundred percent shifting of the loss, and because St. Francis also faced respondeat superior claims based on the negligence of two other employees, an indemnity claim is unavailable (Doc. 75 at 8). Second, she claims that *Ellis* and *Teepak* preclude the suit because St. Francis really seeks post-settlement contribution (Doc. 75 at 10). Third, she says the statute of limitations has expired on this claim (Doc. 75 at 10–11). None of these arguments is persuasive.

Foster's first argument asks the court to throw out the baby with the bath water. It is true, as already pointed out, that indemnity implied by law is not ordinarily available to joint tortfeasors, and that indemnity is a one hundred percent shifting of a loss. Rather than being separate rules, however, these statements are merely reflections of the same concept.

As noted, indemnity implied in law is equitable in nature. Equity is not generally available to malfeasants. *T.S.I. Holdings, Inc. v. Jenkins,* 260 Kan. 703, 720, 924 P.2d 1239, 1250 (1996) ("no person can obtain affirmative relief in equity with respect to a transaction in which the person has been guilty of inequitable conduct"). Thus, indemnity will not be implied in law when the culpability of the indemnitee is of the same kind and character as the indemnitor's. This means that, ordinarily, indemnity implied in law is unavailable to joint tortfeasors. Thus, when it is available, it is a one hundred percent shifting of the loss.

St. Francis' culpability is not of the same kind and character as Foster's. Respondeat superior liability is derivative liability. *Leiker v. Gafford,* 249 Kan. 554, 557, 819 P.2d 655, 657 (1991) (quoting other authorities). The negligence entitling a plaintiff to recover from an employer is the negligence of the employee. There has been no allegation that St. Francis was independently negligent; therefore, St. Francis' only liability to Squier was the liability derived from the three nurses. In other words, St. Francis itself, unlike Foster, breached no standard of care. Because the character of their culpability is so different, the common law bar on indemnity between joint tortfeasors is inapplicable.

There can be no question but that St. Francis' indemnity cause of action would lie against Foster if she had been the only negligent agent of St. Francis. The question then is this: does the mere fact that there may have been several negligent agents of an innocent employer rather than only one completely destroy the right that the employer would otherwise have had to obtain indemnity?

Keeping in mind that indemnity implied in law is an equitable concept and is therefore bound up in public policy considerations, the court believes the question must be answered in the negative. However, there remain the questions of whether and, if so, to what extent, Foster may compare the fault of others. This issue has not been briefed by St. Francis and Foster. It is court's preliminary view that St. Francis has the burden to show that its $625,000 settlement was reasonable and that Foster was one hundred percent responsible for it. Foster may challenge the reasonableness of the settlement amount and may assert the fault of any person for whose negligence St. Francis was responsible under respondeat superior. The court has reservations regarding Foster's announced plan to compare the fault of the physicians who paid the majority of the Squier settlement because St. Francis was not responsible for their negligence. The parties may address these questions by memoranda according to the schedule set forth below.

Moving to Foster's second argument, Foster perceives St. Francis' fifth cause of action as arising under the comparative implied indemnity rubric of *Kennedy,* rather than under traditional indemnity implicit under the doctrine of respondeat superior. As a result, Foster mistakenly believes that *Ellis* and *Teepak* bar the action against her. Both *Ellis* and *Teepak* involved attempts to seek contribution from primary, rather than derivative, tortfeasors. The su-

preme court's discussions and analyses were peculiarly relevant to primary tortfeasors. The court was not faced with, and did not discuss, indemnity suits brought by derivative tortfeasors. Because St. Francis' indemnity claim against Foster is implied by virtue of her employment relationship, *Ellis* and *Teepak* are inapplicable. *See Clark v. Assocs. Commercial Corp.*, 149 F.R.D. 629, 633–34 (1993) (Belot, J.).

The linchpin of the courts' analyses in *Ellis* and *Teepak* was that comparative fault eliminated the equitable need for *contribution* between joint tortfeasors. Implied *indemnity* actions brought by vicariously liable employers against negligent employees do not arise under the theory of *contribution.* Indemnity in that context is a distinct doctrine. Moreover, in an action against an employer for injuries caused by a negligent employee, there is no comparison of fault between the employer and the employee; the negligence of the employee is the negligence of the employer. Thus, with respect to the portion of an employer's liability arising from application of the doctrine of respondeat superior, the employer and employee are not distinct entities whose fault may be compared under K.S.A. 60–258a.

■ Foster's third argument is that the statute of limitations barred St. Francis' indemnity claim when it barred Squier's cause of action against her (Doc. 75 at 10–11). Squier's claim accrued around January 31, 1990. Kansas' statute of limitations on medical malpractice cases is two years, K.S.A. 60–513(a)(7); therefore, Foster says St. Francis' indemnity claim was barred after about January 31, 1992. Because St. Francis filed this suit on August 11, 1994, Foster says the claim is time barred. The only authority Foster cites is *Reeve v. Union Pac. R.R. Co.*, 790 F.Supp. 1074 (D.Kan.1992) (Lungstrum, J.).[27] *Reeve* dealt with a pure *Kennedy* style comparative implied indemnity claim in one of the only two contexts where such claims

are still recognized, a Federal Employers Liability Act case. St. Francis' fifth cause of action arises from St. Francis' employment relationship with Foster. *Reeve* therefore has no application to the present case.

■ It is well settled in Kansas that an indemnity claim does not arise until the indemnitee becomes obligated to pay, whether by judgment or settlement. *See Barbara Oil Co. v. Kansas Gas Supply Corp.*, 250 Kan. 438, 455–56, 827 P.2d 24, 37 (1992). In *Barbara Oil Co.* the Kansas Supreme Court directly considered whether to modify this rule in a Uniform Commercial Code context by holding that an indemnity claim accrues when the underlying cause of action accrues. *Id.* at 455, 827 P.2d at 36–37. The supreme court rejected the proposed modification. In fact, this court has found no case, in any context, in which a Kansas court has taken that view. This court sees no reason why the supreme court would do so here.

■ In this case St. Francis became obligated to pay on August 11, 1992 when it entered the settlement agreement with Squier. In Kansas, indemnity claims are considered contractual. *Kennedy v. City of Sawyer*, 228 Kan. 439, 455, 618 P.2d 788 (1980) ("indemnity is a creature of contract"); *Symons v. Mueller Co.*, 526 F.2d 13, 17 (10th Cir.1975) (quoting 41 Am.Jur.2d *Indemnity* § 3). The statute of limitations on unwritten contracts is three years. K.S.A. 60–512(1) (1994). Therefore, St. Francis' action is timely. Summary judgment is denied on St. Francis' implied indemnity claim against Foster.

## D. LACK OF CORPORATE CAPACITY TO BE SUED

Based on the court's rulings above, St. Francis has only one remaining cause of action against CCI and FNI. This is its claim that CCI breached the express terms of the Staffing Contract by failing to purchase or provide liability insurance for Foster.[28] CCI

---

**27.** At oral argument, Foster also cited the case of *O'Neill Oldsmobile, Inc. v. Hollis and Miller Group, Architects and Engineers, Inc.*, 795 P.2d 952 (Kan.Ct.App.1990) (Briscoe, J.). In that case, however, the Tenth Circuit expressly did

not reach the statute of limitations issue raised by the appellant. *Id.*, at *3.

**28.** The court is not clear on the precise nature of the alleged breach. Neither CCI nor FNI ever

argues that it is immune to all claims, including this one, however, because it no longer has the capacity to be sued (Doc. 72 at 5–9).

■ Federal Rule of Civil Procedure 17(b) provides that "[t]he capacity of a corporation to sue or be sued shall be determined by the law under which it was organized." *See also Brown v. Kleen Kut Mfg. Co.*, 238 Kan. 642, 646, 714 P.2d 942, 945 (1986) ("In determining whether a dissolved corporation has the capacity to be sued, we look to the law of the state of incorporation"). CCI was organized under Colorado law. CCI refers the court to Colorado Revised Statute 7–26–120, which reads as follows: "dissolution of a corporation in any manner shall not take away or impair any remedy available to or against such corporation . . . if action or other proceeding thereon is commenced within two (2) years after the date of dissolution." Colo.Rev.Stat. § 7–26–120 (1994).[29] Under this statute, a corporation may not normally be sued more than two years after its dissolution. "That two year period is applicable whether or not notice of dissolution actually is given to any creditor." Nancy A. Clodfelter, et al., *An Overview of the New Colorado Business Corporation Act*, 22 Colo. Law. 2337, 2348 (1993); Nancy A. Clodfelter, et al., *An Overview of the Proposed Colorado Business Corporation Act*, 20 Colo. Law.2045, 2048 (1991). CCI dissolved on June 28, 1991. St. Francis filed this lawsuit August 11, 1994. CCI therefore argues that it lacks the capacity to be sued (Doc. 72 at 7).

St. Francis claims that the doctrine of equitable estoppel precludes CCI from asserting its defense of lack of corporate capacity (Doc. 78 at 34–36). In support, St. Francis cites *Cooper v. First Interstate Bank*, 756 P.2d 1017 (Colo.Ct.App.1988); *Garrett v. Arrowhead Imp. Ass'n*, 826 P.2d 850 (Colo. 1992); *Strader v. Beneficial Finance Co.*, 191 Colo. 206, 551 P.2d 720 (1976). In *Cooper*

the Colorado Court of Appeals recited the rule that equitable estoppel can prevent the running of a statute of limitations, but held the rule inapplicable on the facts. 756 P.2d at 1019–20. In *Garrett* and *Strader* the Supreme Court affirmed that equitable estoppel can toll the running of a statute of limitations, depending on the particular facts of the case. *Garrett*, 826 P.2d at 854–55; *Strader*, 551 P.2d at 724.

■ For understandable reasons the parties have approached the question of corporate capacity as though it were a question concerning the application of a statute of limitations. Nevertheless, the questions are distinct. *Soo Line R.R. Co. v. B.J. Carney & Co.*, 797 F.Supp. 1472, 1479–80 (D.Minn. 1992). The courts have repeatedly held that equity cannot toll the expiration of a corporate survival statute such as § 7–26–120. *See, e.g., Canadian Ace Brewing Co. v. Joseph Schlitz Brewing Co.*, 629 F.2d 1183, 1188 (7th Cir.1980); *Van Pelt v. Greathouse*, 219 Neb. 478, 364 N.W.2d 14, 19 (1985); *Indiana Nat'l Bank v. Churchman*, 564 N.E.2d 340, 343 (Ind.Ct.App.1990). On the other hand, it has been persuasively held that under the doctrine of equitable estoppel an entity that holds itself out as a corporation cannot later deny its corporate existence when to do so would prejudice those who relied upon the representations of corporate status. *Soo Line R.R. Co. v. B.J. Carney & Co.*, 797 F.Supp. 1472, 1480 (D.Minn.1992). Although the court has not found a Colorado case on point, this principle seems to be consistent with Colorado law on equitable estoppel. *See Garrett,* 826 P.2d at 854–55; *Shell Western E & P, Inc. v. Bd. of County Comm'rs*, 923 P.2d 251, 254 (Colo.Ct.App. 1995). For this reason, the court finds it applicable here.

specifically address the breach of contract cause of action.

**29.** It appears to the court that § 7–26–120 applies only to nonprofit corporations. *See* Colo. Rev.Stat. § 7–20–101 (1990) ("Articles 20 to 29 of this title shall be known and may be cited as the 'Colorado Nonprofit Corporation Act'"). The various statements of fact submitted for summary judgment do not specifically indicate

whether CCI was a for profit or nonprofit corporation. CCI's Articles of Incorporation (Doc. 72, Sterling Depo. Ex. 1) are similarly uninformative. Because St. Francis has not objected to CCI's reliance on § 7–26–120, and because the corporate capacity statute applicable to for profit companies is virtually identical, *see* Colo.Rev. Stat. § 7–8–122, the court need not resolve the question of CCI's profit orientation.

Whether equitable estoppel exists is a question of fact. *Shell Western E & P, Inc.*, 923 P.2d at 254. St. Francis has the burden of proving its claim of equitable estoppel. Thus, for purposes of summary judgment, St. Francis must present evidence sufficient to allow a jury to make a finding in its favor on each element of equitable estoppel. The four elements of equitable estoppel follow: (1) "[t]he party to be estopped must know the facts," (2) the party to be estopped "must intend that its representation be acted on so that the other party is justified in relying upon the represented facts," (3) "the party asserting estoppel must be ignorant of the actual facts," and (4) "must reasonably have relied, to its own detriment, on the other party's conduct or misrepresentation." Moreover, the "conduct giving rise to the representation need not be negligent or intentional." *Id.* at 254.

CCI argues that the evidence is insufficient to create a jury question on the issue of equitable estoppel (Doc. 86 at 6–11). The court disagrees. The evidence shows that CCI and FNI sent repeated correspondence to St. Francis describing their transaction as a merger. The purpose of the letters was to persuade St. Francis to maintain its relationship with FNI following the transaction. In order to do this, CCI and FNI included language emphasizing that there would be no disruption in service or quality because the two companies were combining their resources. One of the letters specifically referenced the fact that the owner and president of CCI would be working together with the founder and president of FNI. CCI and FNI fully intended for St. Francis to rely on their representations by adhering to and renewing the Staffing Contract.

Second, CCI knew the actual facts. CCI and FNI specifically designed their combination as an asset purchase. FNI specifically declined to accept certain CCI liabilities, including the contingent liability arising from Foster's treatment of Squier. The Agreement required CCI to insure against any outstanding liabilities. CCI argues that Sterling, a mere business lay person, cannot be held accountable for knowing the legal significance of characterizing the corporate transaction as a merger (Doc. 86 at 8, 9–10). Be that as it may, there is more than adequate evidence to support an inference that she knew there was a practical difference, and that FNI was more likely to retain St. Francis' business the less disruptive the transaction appeared. In any event, the issue here is the knowledge of CCI, not the knowledge of Sterling. CCI is chargeable with knowledge of the true nature of the transaction, and it is chargeable with the representations Sterling made in the letters to St. Francis. As noted, it is immaterial whether CCI intentionally, negligently, or innocently misled St. Francis as to the nature of the Agreement. The bottom line is that CCI did know the actual facts of the Agreement and misrepresented those facts.

Third, the evidence supports an inference that St. Francis could justifiably rely on CCI's representations, and that it reasonably did rely on them to its detriment. While it is uncontroverted that CCI and FNI mailed a bulk sale notice to St. Francis, for purposes of summary judgment the court must accept St. Francis' evidence that the person to whom the notice was addressed, Ray Rancuret, never received it. Accordingly, viewed in the light most favorable to St. Francis, a jury could reasonably infer that St. Francis was ignorant of the true nature of the Agreement. Having produced evidence on each of the four elements of equitable estoppel, St. Francis is entitled to take this issue to a jury. The court must deny CCI's motion for summary judgment (Doc. 71) to the extent it relies on lack of corporate capacity.

## E. SUCCESSOR LIABILITY

FNI claims that it cannot be held liable for the Squier settlement because it is not the successor of CCI (Doc. 74 at 11–15). In its initial memorandum, FNI relied on Kansas law, but includes a paragraph stating that the rules of law are identical in Colorado. FNI failed to present any choice of law authority or analysis despite the fact that this is a threshold consideration.

St. Francis responded that Colorado law governs the question of successor liability (Doc. 78 at 36–37). St. Francis then argued that under Colorado law two exceptions to

the general rule of non-liability apply (Doc. 78 at 37–40). The first is the merger or consolidation exception and the second is the mere continuation exception. Finally, St. Francis also argued that FNI is estopped to deny that the transaction was a merger for substantially the same reasons that CCI is estopped to deny that it lacks corporate capacity (Doc. 78 at 40).

In its reply brief FNI presented its first choice of law analysis and argued that Texas law governs (Doc. 83 at 7–9). St. Francis filed a sur-reply solely for the purpose of addressing FNI's tardily presented choice of law argument (Doc. 88 at 2). The court fully joins St. Francis' criticism of FNI's presentation of this issue. "If FNI wished to argue that Texas law applied, it should have done so in its Memorandum in support of its Motion for Summary Judgment, so that St. Francis could have properly responded to such arguments in its Response Brief" (Doc. 88 at 3). Because choice of law is a threshold issue and because it is relevant to the future of the case, however, the court asked the parties to address this issue at the hearing on the summary judgment motions.

### 1. *Choice-of-Law*

 As noted, the law of Kansas, including its law on choice-of-law, governs in diversity actions. FNI belatedly argues that the Kansas rule deferring to contractual choice-of-law provisions controls, that FNI and CCI chose Texas law, and that Texas law bars successor liability (Doc. 83 at 7–8; Doc. 89 at 2–4). St. Francis correctly points out, however, that contractual choice-of-law provisions only govern the interpretation of a contract, not the legal effect of the transaction (Doc. 88 at 5–6).

Restatement (Second) Conflict of Laws § 187 (1971) [30] reads as follows:

§ 187. Law of the State Chosen by the Parties (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue. (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless . . .

\* \* \* \* \* \*

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

There are two key portions of sub-section (1) that support St. Francis' position. First, the choice-of-law provision governs *the parties' contractual* rights and duties. In this case, St. Francis was not a party to the contract, and does not seek an interpretation or determination of the contractual rights and duties of FNI vis-a-vis CCI. Second, the choice-of-law provision generally applies only to issues the parties could have resolved by an explicit provision. Two parties cannot by contract control the liability of one of the parties to a nonparty. Although one party can agree to indemnify the other, that agreement does not restrict the claimant's right to sue or collect from the indemnitee. Moreover, it would be against the fundamental public policy of Kansas and Colorado to allow parties to a contract to control or extinguish their liability to nonparties in that fashion. As a result, CCI's and FNI's choice of Texas law does not govern the question of FNI's successor liability.

 In Kansas, the liability of a dissolved predecessor corporation and its successor is governed by the law of the jurisdiction where the predecessor was formed and where the transfer of its stock and assets

---

**30.** Both the Kansas Supreme Court and the Tenth Circuit Court of Appeals have looked to Restatement (Second) Conflict of Laws § 187 (1971) for guidance. *See, e.g., Mark Twain Kansas City Bank v. Cates*, 248 Kan. 700, 705, 810 P.2d 1154, 1158–59 (1991); *Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 825 (1996) (quoting the Supreme Court quoting the Restatement); *Shearson Lehman Bros., Inc. v. M & L Investments*, 10 F.3d 1510, 1514–15 (1993).

took place.[31] *Brown v. Kleen Kut Mfg. Co.*, 238 Kan. 642, Syl. ¶ 1, 644–46, 714 P.2d 942 (1986). CCI was formed in Colorado. Where the transfer of assets occurred is less clear. FNI contends that the transfer of assets took place in Dallas, Texas (Doc. 83 at 7), while St. Francis contends that it occurred in Denver, Colorado. Although the court asked the parties to brief the court on what constitutes a transfer of assets and how to determine when a transfer of assets occurred, they have provided no authority.

The Agreement declares that it was executed at Dallas, Texas (Doc. 79, Sterling Depo. Ex. 10 at 1). It calls for the Closing to be held in Dallas or at such other place agreed to by the parties (*id.* at 4 § 1.4), and requires CCI to deliver instruments transferring to FNI its interest in its assets at the closing (*id.* at § 1.5(a)). At oral argument, however, the parties conceded that FNI signed the Agreement in Texas, that CCI signed it in Denver, and that there was no physical transfer either of assets or of instruments of title. They further agreed that there are no additional facts to be developed on this issue.

All of CCI's assets were located in Denver at the moment of transfer. The physical assets, including the Denver offices, personnel files, contract documents, and employees, remained in Denver following their transfer to FNI. Assuming for the sake of argument that CCI's intangible assets flew across Oklahoma and alighted in Texas upon transfer of ownership, CCI's Colorado incorporation and the continued presence of the physical assets in Denver convince the court that Colorado law applies.

### 2. *Equitable Estoppel*

█ The court has already set forth the standards relevant to the application of equitable estoppel under Colorado law. The court has reviewed FNI's argument that it is not estopped from denying successor liability (Doc. 83 at 15–18), but finds that the court's analysis of estoppel in the context of CCI's argument of lack of corporate capacity is applicable here. For the identical reasons, the court finds that there is evidence that FNI knew that its transaction with CCI was an asset purchase, that St. Francis did not know that the transaction was actually an asset purchase, that FNI represented to St. Francis that it had merged with CCI, that it intended for St. Francis to rely upon that representation, and that St. Francis reasonably relied upon that representation to its detriment.

The heart of FNI's counter-argument is that St. Francis did not reasonably rely on the representation (Doc. 83 at 16–17). FNI says that the testimony of St. Francis' employees does not suggest reasonable reliance. Kathleen Bachman testified that she had a conversation with a member of St. Francis' legal department regarding the CCI/FNI transaction. "Basically the question was it a merger or what is it" (Doc. 83, Ex. D at 52). She was asked what the nature of the concern was that led to the question of how to characterize the transaction (*id.* at 53). She responded, "No, except for the title of the company, billings. Some of that was addressed in the letter. Was there still going to be a Denver office." FNI ignores a key portion of Bachman's testimony. When asked whether she had any personal understanding in 1991 as to the nature of the transaction, she answered, "No, except they did call it a merger" (*id.* at 50).

At his deposition Ray Rancuret testified that he understood the transaction to be a combination of a merger, stock sale, and asset sale (Doc. 83, Ex. B at 30). FNI claims that this evidence shows that St. Francis was not overly concerned with the exact nature of the transaction and that the employees did not believe that the transaction was a merger. For this reason FNI argues that St. Francis either was not relying on the representation or was under a duty to investigate it. FNI cites no authority for its assertion.

---

**31.** At one point FNI interprets the *Brown* court's reference to the place of incorporation to mean the *successor's* place of incorporation (Doc. 83 at 7). Later, FNI interprets the *Brown* court to stand for the proposition that "predecessor liability is governed by the location of incorporation, and successor liability is governed by where the subsequent transfer of corporate stock and assets took place" (Doc. 89 at 3). The court finds both readings to be strained and unpersuasive, not to mention inconsistent.

Moreover, in his affidavit Rancuret testifies that he advised Bachman that St. Francis need not request new certificates of insurance from CCI/FNI because the transaction was a merger.

Viewing the evidence in the light most favorable to St. Francis, there is adequate evidence of reliance. Bachman and Rancuret both considered the transaction to have been a merger, at least in part. It apparently has not occurred to FNI that St. Francis' lack of concern may have been directly attributable to CCI's and FNI's representations that the transaction was a merger. Because St. Francis has produced evidence on each element of its equitable estoppel claim, St. Francis is entitled to a jury determination of whether FNI is estopped from denying successor liability. As a result, it is unnecessary for the court to consider the merits of St. Francis' and FNI's arguments on the issue of successor liability.

## F. EQUITABLE DEFENSES: WAIVER, ESTOPPEL, AND LACHES

FNI raises three additional equitable defenses: waiver, estoppel, and laches. St. Francis apparently forgot to address these arguments in its memoranda (Docs. 78 & 88). The court does not, however, view that omission as a concession.

■ Whether the equitable doctrines of waiver, estoppel, and laches apply is a question of fact. *Stratmann v. Stratmann,* 6 Kan.App.2d 403, Syl. ¶ 8, 410–11, 628 P.2d 1080 (1981). The court will consider the arguments in the order raised.

### 1. *Waiver*

■ FNI claims that St. Francis waived its third cause of action: breach of contract for CCI's failure to buy insurance for Foster (Doc. 74 at 34–35). FNI cites two cases. *See Stratmann v. Stratmann,* 6 Kan. App.2d 403, 628 P.2d 1080 (1981); *United Am. State Bank & Trust v. Wild West Chrysler Plymouth, Inc.,* 221 Kan. 523, 561 P.2d 792 (1977). "Waiver in contract law implies that a party has voluntarily and intentionally renounced or given up a known right, or has caused or done some positive

act or positive inaction which is inconsistent with the contractual right. Once it has been established that a right has been waived, the party possessing the contractual right is precluded from asserting it in a court of law." *Stratmann,* 6 Kan.App.2d at Syl. ¶ 8, 410–11, 628 P.2d 1080 (quoting *United Am. State Bank & Trust,* 221 Kan. at Syl. ¶ 2, 526–27, 561 P.2d 792). "The intent to waive known rights is essential." *Id.* (quoting *Prather v. Colorado Oil & Gas Corp.,* 218 Kan. 111, 117 542 P.2d 297 (1975)). "Waiver is consensual in nature but the intention may be inferred from conduct and the knowledge may be actual or constructive." *Zenda Grain & Supply Co. v. Farmland Indus., Inc.,* 20 Kan.App.2d 728, 746, 894 P.2d 881, 894 (1995) (quoting *City of Wamego v. L.R. Foy Constr. Co.,* 9 Kan.App.2d 168, Syl. ¶ 3, 675 P.2d 912, *rev. denied* 234 Kan. 1076 (1984)). "It is a general rule that mere indulgence or silence cannot be construed as a waiver." *Long v. Clark,* 90 Kan. 535, 135 P. 673 (1913). "A court should be cautious in granting a motion for summary judgment when resolution of the dispositive issue necessitates a determination of the state of mind of one or both of the parties." *Id.* (quoting *Ruebke v. Globe Communications Corp.,* 241 Kan. 595, 605, 738 P.2d 1246 (1987)).

■ Here, FNI relies on St. Francis' inaction in failing to object to Foster's certificate of insurance filed by CCI with St. Francis at the time Foster began work at the hospital. While the court has found no Kansas case defining "positive inaction," it has found two cases in which the court deemed a party's inaction sufficient to constitute waiver. *Compare Stratmann,* 6 Kan.App.2d at 410, 628 P.2d at 1086 (finding waiver); *Bowen v. Lewis,* 198 Kan. 706, 713–14, 426 P.2d 244, 250–51 (1967) (same); *with Iola State Bank v. Biggs,* 233 Kan. 450, 662 P.2d 563 (1983) (finding no waiver). *See also* 28 Am. Jur.2d *Estoppel & Waiver* § 160 (1966) ("Generally, to make out a case of implied waiver of a legal right, there must be a clear, unequivocal, and decisive act of the party showing such a purpose or acts amounting to an estoppel on his part. An implied waiver may arise where a person has pursued such a course of conduct as to evidence an intention to waive a right, or where his conduct is

inconsistent with any other intention than to waive it."). St. Francis' inaction here more closely resembles mere indulgence or silence than the kind of conduct described in *Stratmann* and *Bowen*.

The court cannot say, as a matter of law, that by considering the certificates of insurance filed by CCI to be satisfactory, St. Francis knowingly and intentionally waived its right to bring a breach of contract action against CCI for failing to provide insurance as required by the Staffing Contract. Moreover, St. Francis' acceptance of the insurance certificates need not be viewed as inherently inconsistent with its right to pursue a breach of contract action for failure to provide adequate insurance.

### 2. *Equitable Estoppel*

Next, FNI argues that St. Francis is estopped from bringing any claims against FNI (Doc. 74 at 35). The only case FNI cites is *United American State Bank & Trust*, 221 Kan. at 527, 561 P.2d 792. The court has already set forth Kansas' standards for equitable estoppel, and need not repeat them here. At root, FNI's complaint is that by waiting so long to file its lawsuit, St. Francis has prejudiced FNI because Colorado's corporate continuation statute may preclude it from seeking indemnification against CCI for breach of representations and warranties. Those circumstances alone, however, are insufficient to support an equitable estoppel claim.

An essential element of an equitable estoppel claim is that the action or inaction of the party to be estopped (St.Francis) induce the party seeking estoppel (FNI) to believe that certain facts existed. FNI does not indicate which facts, if any, St. Francis' delay in filing suit caused it to believe, or how FNI reasonably relied on those facts to its detriment. For this reason the court cannot hold that St. Francis is estopped from pursuing its claims.

### 3. *Laches*

FNI's last argument is that laches bars all of St. Francis' claims (Doc. 74 at 37). "The doctrine of laches is an equitable device designed to bar stale claims, and courts of equity will regard long passage of time in asserting claims with disfavor apart

from any particular statute of limitations." *Stratmann*, 6 Kan.App.2d at 411, 628 P.2d 1080 (quoting *Clark v. Chipman*, 212 Kan. 259, Syl. ¶ 6, 510 P.2d 1257 (1973)). "Delay, by itself, does not constitute laches and an action generally will not be defeated by delay alone unless some prejudice has resulted therefrom to the rights or interests of the adverse party." *Id.* (quoting *Darby v. Keeran*, 211 Kan. 133, Syl. ¶ 10, 505 P.2d 710 (1973)). "[T]he person asserting laches must show prejudice." *Id.* "When a party neglects to assert a right or claim for an unreasonable and unexplained length of time, and the lapse of time and other circumstances cause prejudice to the adverse party, relief is denied on the grounds of laches.... For laches to apply, the court must consider the circumstances surrounding the delay and whether there was any disadvantage to the other party caused by that delay." *Steele v. Guardianship & Conservatorship of Crist*, 251 Kan. 712, 725, 840 P.2d 1107, 1117 (1992).

In light of the court's duty to view the evidence in the light most favorable to St. Francis, FNI has not established that St. Francis' delay was unreasonable, was inexplicable, or prejudiced FNI. Squier filed suit against St. Francis on July 23, 1990. St. Francis settled the claims against it on August 11, 1992. It filed suit against FNI on August 11, 1994. The uncontroverted record does not indicate when St. Francis first learned of FNI's separate status or what St. Francis' explanation for the delay, if any, is. While FNI *may* be able to demonstrate prejudice inasmuch as it *may* be barred by Colorado's corporate continuation statute from seeking indemnity from CCI for any liability it faces as a result of St. Francis' claims against it, FNI has not demonstrated that it *is* so barred. For these reasons, the issue of laches must be presented to the trier of fact. In conclusion, the court cannot grant summary judgment based on FNI's arguments of waiver, estoppel, and laches.

### VI. *CONCLUSION*

In light of the foregoing discussion, CCI's and FNI's motions for summary judgment (Docs. 71 & 73) are granted in part and denied in part, while Foster's motion (Doc.

75) is denied in full. Judgment shall be entered in favor of CCI and FNI on St. Francis' first and second causes of action. St. Francis' fourth cause of action, having been abandoned, is dismissed with prejudice.

A motion for reconsideration is neither invited nor encouraged. Any motion for reconsideration must comply with Rule 7.3 of this court and the standards set out in *Comeau v. Rupp*, 810 F.Supp. 1172, 1174 (D.Kan.1992). They must be filed by October 20. The motion may not exceed ten pages in length, including supporting arguments and authorities, regardless of the number of points raised. All responses must be filed by October 27. Responses shall be limited to five pages each. No replies may be filed. Motions for extension of these time periods will be viewed with disfavor. The filing of such a motion does not relieve the party of its obligation to meet the relevant deadline, even if the motion is not ruled upon prior to the expiration of the deadline.

In addition, the parties shall brief the issues pertaining to St. Francis' implied indemnity claim against Foster. Initial briefs may not exceed five pages in substance and must be filed by October 20. Responses may not exceed three pages and must be filed by October 27. No replies may be filed.

The parties shall not circumvent the aforementioned page limits by tampering with standard margins, leading, spacing, or font-size. In addition the parties shall comply with the following specific requirements. All margins shall be at least one inch, there shall be no more than ten characters per inch in both footnotes and text, and single spacing may only be used in block quotes (which must be double-indented) and footnotes. Any document not in compliance with this paragraph shall be stricken without further notice.

By November 3, 1997, the parties shall also submit the following three documents: first, a proposed pretrial order reflecting the court's rulings herein, as well as the numerous issues in the pleadings that have not been resolved; second, a formal plan outlining further discovery, *if any*, necessary before trial; third, proposed jury instructions. It is the court's firm belief that preparation of proposed instructions will help the parties and the court identify and clarify the issues remaining to be resolved. A pretrial conference will be held November 14, 1997, at 2:30 p.m.

IT IS SO ORDERED.